## No. 13,441.

### CITY OF NEW ORLEANS vs. EMANUEL STEINHARDT.

| | |
|---|---|
| 52 | 1043 |
| 104 | 77 |
| 104 | 78 |
| 104 | 79 |
| 104 | 85 |
| 52 | 1043 |
| 110 | 913 |
| 110 | 923 |

#### SYLLABUS.

1. The authority of an attorney at law to represent his client will be presumed, unless challenged under oath.
2. The city of New Orleans is authorized to open and widen streets without a petition from property holders, and the propriety of so doing in a given case is a matter of legislative, rather than judicial, discretion, with which the courts will not interfere except in cases of gross abuse of authority.
3. The city also has the power to authorize the use of the streets for the purposes of railroads, and may, in the same ordinance, provide for the opening and widening of a street, and for its use, when opened and widened, by a steam railroad company, the privilege granted not being exclusive.
4. The assessment made by a jury, in an expropriation case, will not be disturbed unless manifestly erroneous.

A PPEAL from the Civil District Court, Parish of Orleans.— *King, J.*

*Samuel L. Gilmore,* City Attorney, (*Hugh C. Cage* of Counsel) for Plaintiff, Appellant.

*Farrar, Jonas & Kruttschnitt* for Defendant, Appellee.

The opinion of the court was delivered by

MONROE, J.    The city of New Orleans alleges that, acting under the authority conferred upon it by its charter (Act No. 45 of 1896), it adopted an ordinance for the opening and widening of Water and Front streets; that, in order to carry out the purpose of said ordinance, it is necessary to purchase or expropriate a certain strip of land, which is described, belonging to the defendant; that it has tendered him one thousand dollars, which is far in excess of its value for said strip, and the tender has been refused; that said strip is absolutely required for the contemplated public improvement, and that its expropriation by judgment of the court is necessary.    And it prays for a jury to assess the damages, and for judgment, etc.

The defendant sets up, by way of exception:

1.    That the suit was brought without special corporate action or authority, and that the City Attorney was unauthorized to bring it by virtue of his office.

2.    That the petition discloses no cause of action.

For answer, the defendant admits the ownership of the property, and a tender by Hunter C. Leake, claiming to represent the city of New Orleans, of one thousand dollars, as the value or price of the same.

He denies that the city is authorized, under its charter, to open or widen streets, save upon the petition of the property holders, pursuant to Section 99 of said charter, and he further denies that any such petition has been presented for the opening and widening of Water and Front streets, or that there is any ordinance or authority for the acquisition of his property by expropriation.    And he alleges that the sole purpose of the proposed acquisition, as appears from the face of the ordinance, made part of the petition, is to enable the city to carry out a commutative contract, made in its private capacity, with the Chicago, St. Louis & New Orleans Railroad Company; and, under the guise of opening and widening streets, to acquire defendant's property and to turn it over to said corporation for its exclusive use as a road-bed.    That it is proposed to conceal this purpose by terming this

road-bed a neutral ground, but that no power exists in the city to expropriate property in order to leave an idle strip in the middle of the street; and the ordinance is but a scheme and contract whereby the city agrees to prostitute her governmental powers to oppress her citizens and take their property for the purpose of selling it to the railroad company at an enhanced price, said price to consist of the cost of expropriation, and of certain conditions imposed on the railroad company for the benefit of the city of New Orleans and of other members of the community.

That said scheme was rendered the more necessary by reason of the fact that the said railroad company has parted with the control of its railroads in this State to the Illinois Central Railroad Company, a non-resident corporation, and that neither of said companies can exercise the power of eminent domain in Louisiana; and that the exercise of such power, by the city of New Orleans, for their benefit, is *ultra vires,* and a fraud in law; and the taking of his property, under such circumstances, will be to deprive him thereof, without due process of law, in violation of Article 2 of the Constitution of the State, and of the 14th Amendment to the Constitution of the United States.

He further alleges that his property is worth five thousand dollars, but that he refuses to part with it at all.

By supplemental petition, the city alleges that the Chicago, St. Louis & New Orleans Railroad Company and the Illinois Central Railroad Company have accepted the ordinance mentioned in, and made part of, the original petition; and the acceptance is made part of said supplemental petition. Thereafter, the defendant renewed his plea of no cause of action, and it was agreed that the answer filed should be considered as applying to both petitions.

There was verdict and judgment in the court *a qua,* in favor of the plaintiff, who has, however, appealed upon the question of amount; and the defendant has answered the appeal, praying for a reversal of the judgment, or, if that be not granted, for an increase of the amount allowed, to $2,500.

The exception that the suit was brought by the City Attorney without special corporate action and authority, is dilatory in its character, and was filed after the cause was called for trial, the jury empaneled, and a continuance granted on account of the indisposition of the defendant. Under these circumstances, though no answer had been

filed, there is force in the suggestion that it came too late. Preter-mitting this question, however, the exception was not verified by affidávit, and it has been held that the authority of an attorney at law to represent his client will be presumed, unless challenged under oath. Succession of Patrick, 20th Ann., 204; Dockham vs. Potter, 27th Ann., 73; Bender vs. McDowell, 46th Ann., 393.

Beyond this, the ordinance, made part of the petition, provides for the purchase and expropriation of certain property, including that owned by the defendant, who admits, in his answer filed with the exception, that he refused to sell. Under these circumstances, the City Attorney is the proper officer to carry the ordinance into effect. Act 45, of 1896, Section 36.

The exception of "no cause of action" may be considered with the merits.

The ordinance mentioned contemplates the making of a continuous street, or boulevard, 110 feet wide, along the river front, from Penis-ton street to the upper boundary of the city, a distance of several miles. The plans offered in evidence show that, by reason of the con-formation of the city, between those points, and the manner of its growth, and, perhaps, other causes combined, the streets nearest the levee not unfrequently stop short, necessitating a movement at right angles, in the direction of the river or the lake, and the taking of another, parallel street, in order to go either up or down. Thus Water street is stopped abruptly, and finally, at Upperline street, by private property, which is bounded in front by the levee, and in the rear, by Front street. But Front street is one hundred feet farther back than the rear line of Water street. Five squares farther up, Front street misses its own connection; that is to say, the river line, on the lower line of Valmont street, is not continued as the river, but as the lake, line, on the upper side of that street, thus missing the con-nection by the width of the street. Seven squares farther up still, Front street, which, after the cessation of Water street, is the nearest street to the levee, is cut off permanently by the Marine Hospital property, and from that point to the city's upper boundary, as we understand the plans, there is no street or thoroughfare upon the inside of, and near, the levee. The plans also show that, for the purposes of the proposed improvement, the utilization of Water and Front streets, if not indispensible, is certainly the most rational course to adopt, and the one which will create the least disturbance

of private rights. Considering the ordinance, therefore, in connection with the plans, and apart from any connection with the railroad company, the improvement proposed seems to be calculated to subserve the public interest and convenience.

The Chairmaa of the Streets and Landings Committee of the City Council says, in regard to it:

"The Committee found the river front, above the Stuyvesant Docks, in a bad condition, full of ponds and impassable. The Committee thought that the river front, all the way up the protection levee, might be advantageous to commerce by having a railroad track and street along there, that the ground could be used for the establishment of manufactures, where they could have the advantage of switch tracks. And, after taking all these things into consideration, believing that it would benefit the whole city of New Orleans, the Committee decided on a neutral ground, with a roadway on the river side, and a roadway on the city side; * * * the Committee formed their judgment that the road on the city side could be used by the people, and the road on the outside could be used for the purposes of commerce, and they thought it would be better to have sufficient provision for future development."

It is said that the city is without power to open or widen streets except upon the petition of the property holders, and agreeably to Section 99 of the charter; but we find such power conferred in express terms, and without reference to any action by the property holders, by Section 15 of the charter,. whilst Section 99 provides that streets may also be opened and widened upon petition of the property holders, but, in such case, the cost is to be borne by those whose property receives the benefit, and not, as in the other case, by the city at large.

Not only is it true that the city is authorized, by express grant, to open and widen streets, but we think it may be regarded as well settled that, in the exercise of the power, whether to open, widen, or improve streets, its discretion will not be controlled by the courts. Dillon on Municipal Corporations, Vol. 1, Section 9; Inhabitants vs. City, 14th Ann., 452; Canal and Navigation Co. vs. City, 38th Ann., 308. The same section, which confers authority to "order the ditching, filling, opening, widening and paving of the public streets," also confers the power "to authorize the use of the streets for railroads operated by horse, electric, steam, or other motive power," etc.; and this court has held, in a case where it was urged, "that the city had no

right to designate neutral ground in the centre" of the street, that the administrative power, with regard to the streets is plenary, and that it is settled doctrine that the city may designate the part of the street to be occupied by a street railway company. Schmitt vs. City, 48th Ann., 1441.

It is thus seen that the work contemplated by the ordinance is a work of public improvement, irrespective of any particular interest or concern that the railroad company may have in it; that the matter of making or not making such improvement, of its wisdom or unwisdom, is a subject for the exercise of legislative and not of judicial discretion; that the city has power, conferred by express grant, to authorize steam railroads to use the streets; and that, it is established jurisprudence in this State that a particular part of a street may be designated for the use of a street railroad. It would be difficult to find any reason for making any distinction, in this latter respect, between a street railroad and any other railroad, and we conclude that the power to authorize the use of the streets by any railroad carries with it the power to determine where and how the tracks shall be laid.

The next inquiry is, what has the city actually done in the present case?

The ordinance provides for the widening of Water street for a certain distance, from a width of fifty feet to one hundred and ten feet; for connecting it, by an oblique turn, with Front street; for a similar widening of Front street, between Upperline and Valmont streets, by the addition of a strip sixty feet wide on the river side; and, between Valmont and Joseph streets, by the addition of a like strip on the lake side; for the opening of a new street from Joseph street, between the park and the river, to the upper limits of the park; and for an extension of such street from the point last mentioned to Hilary street, and on to the upper boundary of the parish, within sixty feet of the inner toe of the levee, the private property necessary for the purpose to be purchased or expropriated.

The ordinance, taken in connection with the plans to which it refers, further provides, that the street thus contemplated, one hundred and ten feet wide, shall have two banquettes, each eight feet wide, and two roadways for vehicles, each twenty-two feet wide, and, between these roadways, a neutral ground, fifty feet wide.

It is further provided that the Chicago, St. Louis & New Orleans Railroad Company, its lessees, successors and assigns, shall have the

right to construct and maintain two tracks upon the lake side of the neutral ground thus provided for, upon the condition:

1. That the entire cost of purchasing and expropriating property, as provided by the ordinance, shall be paid by said company, although the property acquired shall be, and remain, perpetually dedicated to public · use for street purposes and purposes provided for by the ordinance.

2. That the company shall provide the funds necessary to move the levee, in front of the park, farthur out, the consent and co-operation of the authorities being first obtained.

3. That the company shall construct, on the river side of the neutral ground of the new street, between the park and the upper boundary of the parish, two tracks, similar in all respects to. those which it constructs ·for its own purposes on the lake side of said neutral ground, which tracks shall belong to the city of New Orleans, for the public use.

It is further provided that all tracks, connections, spurs and switches shall be laid and constructed on lines and grades to be furnished by the city engineer; that the railroad company shall so maintain the road as as not to obstruct the drainage; that it shall keep in order the entire neutral ground above the park, and also below the park, until the river side of that portion is occupied by the tracks of other roads, or public tracks; that all intersections of streets shall be planked or paved by the company, between tracks and between rails, and easy approaches provided; that the company shall not discriminate illegally or unjustly against the city; that it shall belt, over its tracks in the city,. at a rate not to exceed $1.50 per car, its own cars and those of other companies and individuals, without unjust dis ·crimination, provided that it shall not be obliged to handle cars for other companies at a lower rate than is charged by such companies for similar service.

There are other provisions, as to the beginning and completion of the work, and to the effect that the company shall acquire no rights until the conditions imposed on it are fulfilled.

Comparing what the city has done, with what it has the right to do, the action taken seems to be within the limits of the authority con ferred by the charter. If a street one hundred and ten feet wide now existed between Peniston street and its upper boundary, the city could make a neutral ground fifty feet wide in the middle of it, and could

authorize any railroad company to lay its tracks thereon, as provided by the ordinance under consideration.

There is no exclusive grant to the railroad company, and no taking of property without due process of law, or acquiring of it through the right of eminent domain in order to sell it at an enhanced price to a private corporation. It happened that, for several miles along the levee, there was no continuous thoroughfare for any purpose, and still less was there any street wide enough, or straight enough, or long enough to enable steam trains to reach the Mississippi river and thus connect the land and water carriers, and the interstate and foreign commerce carried on through this port. The officers, whose duty it was to consider the questions, reached the conclusion that some action should be taken, not for one reason, but for a variety of reasons, either of which would have been sufficient, and not for the benefit of one person, or one corporation, but in the interest, and for the advantage, of the entire community. They realized that they were vested with authority to open streets and to widen them, and to permit the use of them for railroads, and that it would be in the interest of the city so to exercise that authority as to furnish a free passage up and down the levee to the public at large, and at the same time provide a means whereby imports and exports might be transferred at ship's side. They, therefore, used their power in each of the directions mentioned in aid of its exercise in the other. In deliberating as to the opening of a thoroughfare along the river front, it was the part of wisdom for them to consider the uses which would be made of it, and if they contemplated, as they did, that it would be used for steam railroads, as well as for other purposes, it would have been folly for them not to have provided accordingly. It would be a bad use of discretion to open an alley where a street is needed, or to open a narrow street where there is demand for a wide one, just as it would be bad judgment to pave where there is no hauling, and to leave unpaved, the streets over which the heaviest traffic is conducted. But the determination of these questions is entrusted to certain officers, and it is scarcely a proper subject for the consideration of the courts.

Something has been said in argument concerning the fact that there is to be a curb about eight inches in height upon either border of the neutral ground, and it is argued that this amounts to an exclusion of the public at large from that portion of the street and its practical appropriation by the Chicago, St. Louis & New Orleans Railroad Com-

pany for its own purposes. It will be remembered, however, that no exclusive grant is conferred upon the corporation mentioned, even as to the tracks which are to be laid for its use; whilst, upon the other hand, express provision is made for the accommodation, upon the same portion of the street, of other roads, as occasion may require, or the city may determine. The banquettes upon streets are generally curbed, with a view to separate them from the roadways and protect the public from the dangers incidental to the indiscriminate mixing of pedestrian and vehicular travel, and, whilst a pedestrian may travel on the roadway, if he chooses, he is practically excluded by the perils which he is likely to encounter, but vehicles are not permitted to make use of the banquettes.

In the present case, if pedestrians, or bicyclists, or automobilists, or persons moving about in vehicles drawn by horses, should choose to make use of the portion of the street upon which railroad tracks are laid, and over which steam trains may be continually passing, in preference to using the banquettes and roadways which are alongside, and which are especially intended for, and adapted to, their service, we find nothing in the ordinance before us which would prevent their doing so, nor will the curbing prevent their obtaining access to the neutral ground at the street crossings. The case, therefore, differs materially in its facts from that of Lagare vs. Chicago, 139 Ill., 46, to which we have been referred, where it appeared that a street, upon which there was already one steam railroad track, was to be widened, by expropriation, and six additional tracks were to be laid, and the seven tracks were to be entirely cut off from the rest of the street by a brick wall twelve feet high. It was there held that the expropriation was for the exclusive benefit of the railroad companies, and the court refused to sustain it. Our conclusion, then, is that the present expropriation proceeding is a competent exercise of authority on the part of the city government.

The defendant paid six thousand five hundred dollars for his property, in 1897. It measures two hundred and fifty-one feet front on Front street, by a depth of two hundred feet between the parallel streets, Soniat and Dufossat, and runs back from Front street to the toe of the levee. In addition to this, however, it has a batture extending six hundred feet in front of the levee, which is under water in high stages of the river, and which is known as a growing, or making, batture. Most of the witnesses who were examined value the

property, inside the levees, at three thousand five hundred dollars, which, considered with reference to the price paid for the whole, would fix the value of the batture at three thousand dollars. The strip, sixty feet in length, to be taken from the Front street side of the property, is somewhat less than one-third of the square inside of the levee, valued at three thousand five hundred dollars, but it leaves a lot 251x140 instead of 251x200, as it now stands, and as all the testimony indicates that the property is not likely to be wanted for any other purpose than the establishment of a manufacturing plant, we are inclined to think that the taking of the sixty feet may be somewhat prejudicial to the value of the remainder. This, we apprehend, was the view taken by the jury in fixing the value of the strip at one thousand three hundred and fifty dollars. This is, no doubt, a full allowance, but not sufficiently out of the way to justify our interference with it.

The judgment appealed from is therefore affirmed.