(34 South. 868.)

No. 14,818.

CAPDEVIELLE, Mayor, v. NEW ORLEANS & S. F. R. CO. et al.

(May 25, 1903.)

110   904
112  1021
110   904
e117  192

110   904
118   716

RAILROADS—MUNICIPAL ORDINANCES—USE OF DESIGNATED TRACKS — APPOINTMENT OF ARBITRATORS — RIGHTS TRANSFERRED BY CITY — SALE OF PRIVILEGE — BUILDING BRIDGES.

1. The municipality of the city of New Orleans had authority, through the action of the city council, to adopt an ordinance granting the right of use to the defendant corporation of designated tracks, and to provide for permitting other railways to come on these tracks, on the same terms (without discrimination) as those granted to defendant.

2. The grant is not obnoxious to law, on the ground that it is prejudicially perpetual, for the municipality has it in its power to require obedience to stipulations made in public interest.

3. The clause looking to the appointment of arbitrators toward settling differences which may arise is not damaging to any of the substantial rights of the municipality.

4. The arbitrators are given the authority to settle disagreements in matter of details in the management in which the municipality can have no great concern, except to the extent that grantees may undertake to act in contravention of the city's interest.

5. The city has a right which cannot be denied in organizing the board, and also has the right to be heard before the courts in regard to the least detail of the management, if affording ground for complaint.

6. The city has not parted with her police power.

7. The city transferred only such rights as it had the right to transfer, and is not bound to transfer any other right.

8. Although property has been dedicated to public use, the city may make reasonable changes in the matter of the dedication.

9. Railway stations are as necessary to a railway as railway tracks, and can be located on public property.

10. It would be useless to advertise a railway grant of use for sale to interstate roads. There would be one bidder, and for that reason the municipality, under certain conditions and restrictions, may grant the use without first advertising it for sale to the highest bidder.

11. The right to build bridges across her basins may be granted to the extent that the city is concerned.

12. Such grants have the support of custom, and have received the sanction of law.

13. The mayor has the right to stand in judgment in order to test the validity of an ordinance, and it is his duty, in the event that he questions its validity. Subject to the limitations and restrictions laid down in its decision,

the court affirms the decision of the district court.

Nicholls, C. J., and Blanchard, J., dissenting. (Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by Paul Capdevielle, mayor of the city of New Orleans, against the New Orleans & San Francisco Railroad Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Samuel L. Gilmore, City Atty., for appellant. Farrar, Jonas & Kruttschnitt, for appellee; Foster, Milling, Godchaux & Sanders, amici curiæ.

## Statement of the Case.

BREAUX, J. Plaintiff brought this suit to test defendant's right to execute an ordinance of the city council (adopted over his veto) granting rights and privileges to defendant to lay tracks as it proposes, and to establish depots and other improvements needed for railway purposes.

It is contended by plaintiff that the ordinance granting rights of way and privileges to defendant undertakes to grant rights in perpetuity.

The ground on which plaintiff rests to sustain the charge is found in Ordinance 15,080, C. S.

It becomes necessary in stating the facts, as relates to the asserted illegality of the grant by the city to the defendant, to take into account a grant made by the city to the Illinois Central Railroad Company some time prior to the grant made by the city to defendant.

The city authorities entered into an agreement with the Illinois Central Railroad Company which enabled this railroad company to obtain from the city a right of way to reach its Stuyvesant Docks.

As a result of this grant to the Illinois Central Railroad Company, an open space from Peniston street to the upper parish line was obtained for the public.

There is testimony showing that, in addition to opening the street, it was contemplated by the city authorities (under Ordinance 15,080) to establish a belt railway along this line and over this space, to remain under municipal control and ownership.

The ordinance in question looked to the grantee, the Illinois Central Railroad Company, to leave space in the middle of the street, of a mentioned width, to be occupied as a railroad track.

While plaintiff recognizes the right of the city to make temporary grant, plaintiff's contention is that this ordinance (15,080, C. S.) does not admit of a right in the municipal authorities to cede away in perpetuity any tracks along the Illinois Central tracks between Peniston street and the upper parish line.

The insistence of plaintiff is that the dedication to the public of a double-track belt line over the grounds before mentioned is complete, also the reservation on the river front from Peniston street to Carrollton, and that in consequence the right over the same grounds could not be acquired in perpetuity by defendant.

In addition, the contract rights growing out of the agreement between the Illinois Central Railroad Company and the city of New Orleans, as shown by Ordinance 15,080, are urged by plaintiff against defendant's grant.

It is in place here to state that a public belt commission was organized by the city government in order to carry out a belt plan in the city, made up in part of the grounds obtained in the transaction with the Illinois Central Railroad Company, under Ordinance 15,080. The authority of the belt commission over the tracks, the use of which tracks is claimed by defendant under Ordinance 1,615, was referred to in the argument at bar. The necessity of referring to this belt commission will become evident in the course of the discussion.

In stating the case, we leave Ordinance 15,080 and the transaction with the Illinois Central regarding certain tracks, and take up Ordinance 1615 of the city council, which contains the grant to which plaintiff earnestly objects. By this ordinance the city grants to defendant a right of way from the upper line of the city to Henderson street, upon the condition that the defendant company shall, at its own cost and expense, construct and dedicate to perpetual public use the double tracks, as now projected, from the end of the rails on the upper side of Audubon Park to Henderson street; that the construction shall be completed before July 1, 1904, under the direction of the public belt authorities of the city; and that the public belt authorities shall audit the account of the cost of construction, and determine the amount expended by plaintiff in

matter of constructing the improvement set forth.

In another division of the ordinance (1615) it provides that the city shall furnish the ground for the construction of defendant's tracks; that the defendant company shall pay the cost of removal of obstructions on the ground. And in another division of the ordinance it is ordered that the legal title to the whole of the belt tracks, switches, spurs, and sidings shall be in the city, and she alone is to be the owner of tracks and appurtenances under all circumstances; and the ordinance further ordains that, upon the completion of the city's belt system to Clouet street, the tracks in question shall be under the sole and exclusive control and management of the public belt authorities of the city; and it further ordains that in order to provide for a completion of this belt system to Clouet street, and its further continuation, the belt authorities shall have the right and power to grant the right of use of said tracks to any railroad now in, or that may hereafter come into, the city of New Orleans, exacting as a condition of said grant, from each railroad to which said use is granted, a sum equal to the expended amount by the New Orleans & San Francisco Railroad Company for construction of said belt tracks to Henderson street, a distance of 5½ miles.

The amount collected from other railroads, should any elect to come in on equal shares with defendant railroad, is to be deposited under the terms of Ordinance 1615, N. C. S., before mentioned, with the city's fiscal agents, for the special purpose of constructing extensions of belt tracks below Henderson street, as part of the public belt system. While the belt system is to be under the management and control of the public belt authorities, each railroad company using the tracks is to contribute to the maintenance of the tracks on a wheelage basis.

The ordinance further provides that the defendant company and all contributing railroads using the belt line shall have the right to operate their own locomotives, cars, and equipments over the public belt, under the control of the public belt authorities; and, further, this ordinance provides that all railroads using the tracks shall belt all cars to and from their lines over all spurs and switch tracks forming part of the public belt tracks, free of all costs, and that unless otherwise ordered by the public belt authorities, or until the city will operate its own equipment over a complete belt system, the New Orleans & San Francisco Company agrees to belt cars belonging to connecting railroads or individuals over the belt line, switches, spurs, and sidings, at a price not exceeding $2 à car, provided that it shall not be obliged to belt cars for any railroad which may hereafter enter the city, unless such railroad shall become a contributor to the belt railroad construction fund.

In another subdivision of the ordinance it is said that all controversies between any company to which the city may grant the use of these tracks and the defendant, relative to the use of the tracks and appurtenances, or as to the cost of construction or maintenance, or in regard to the rules and regulations relative to the movement and handling of cars, trains, and traffic thereon, shall be submitted to the arbitration of three disinterested persons, one to be selected by defendant, the second by the city, or her public belt officials, or by any other company in interest, and the third by the two thus chosen; and the decision of this tribunal, or any two of them, shall have the effect of an amicable composition.

Plaintiff's complaint is, with reference to the ordinance in question, that there is not a line in the ordinance placing any time limit upon the right granted to defendant to operate its trains, cars, and traffic over the public belt tracks and public reservation between the upper limits of the city to Peniston street, and that, furthermore, the defendant is to have during its charter life the right to use the belt tracks and reservation in question, to which the city should have absolute title, and which the city should, in the near future, use as its own, in operating its belt road for its own railroad purposes.

Another objection of plaintiff is that the board of commissioners of the port of New Orleans has exclusive jurisdiction over the public landings of the city of New Orleans, and the city cannot be bound by contract to obtain from that board for any railroad company a right of way through any part of the public landings.

Again, that the city council cannot alienate the power vested by section 15 of the Charter, as amended by Act No. 131, p. 227, of 1902, to construct, maintain, and operate belt rail-

roads and other public utilities, and to compel all lines of railway and tramway in any one street to run on one and the same track, and that the power is vested in the city by section 87 of the city charter (Acts 1896, p. 72, No. 45), not to grant, but to sell, the privilege of constructing and operating a belt railroad, to whomsoever will offer the highest percentage of gross annual receipts, but that it is without authority to make grants with a free hand.

Plaintiff urges that under Ordinance 1615 the grantee shall be full partner with the public in the use of the public tracks and reservations, and that the ordinance also undertakes to limit the right of the city to make temporary grants of the use of the tracks, by requiring that the city shall not grant to other railroads any right to use the public tracks and reservations without exacting from each road the total costs of the tracks to be built by the grantee on the public reservation from the park line to Peniston street, and along the river front from Peniston street to Henderson street.

Defendant earnestly takes issue with plaintiff in this matter, and denies that it is as plaintiff contends, and avers the ordinance, as interpreted by it, covers a right of way over the whole belt, present and future, for which right it was to pay the cost of building a stated number of miles of double tracks, and for which right every other railroad was to pay the same sum, and to have identically the same privileges, and adds that the defendant, who is the only party in interest, is forcibly and judicially bound by that position. Furthermore, defendant, in answer to plaintiff's contention, urges that the ordinance had no view of weakening or impairing the police power of the city.

Among other objections, plaintiff questions the validity of the grant made to defendant of depot grounds on Basin street, and of right of way for approaches thereto.

Another issue between plaintiff and defendant grows out of the right vel non of the city to authorize the lowering of the trestle over the New Canal and Shell Road to grade; i. e., to bridge the canal if it does not obstruct navigation.

### Opinion.

Whether the use intended to be made of the grant is to be public or private, presents the first issue to which our attention is attracted for decision.

Railroads have come to be considered as public enterprises in which the public is concerned. They are always considered as quasi public corporations, subject to the rules and regulations imposed by the state. The defendant corporation, as relates to franchise and privilege, is entitled to the same right as any other railroad corporation.

We have not found wherein defendant's right of way is private, while others are public.

The ordinance (1615) granting the right of way, eo nomine, provides that the title shall remain in the city of New Orleans for the public, and that after a reasonable time the city shall have control and management of the belt for the public.

Having arrived at the conclusion that the defendant company is a quasi public corporation, we pass to a consideration of the objection urged by plaintiff that the defendant railroad does not possess the means to carry out the gigantic plan it holds out as an inducement.

In answer, we can only say that the defendant corporation is one of the chartered institutions of the state. It has heretofore been considered and treated as one of the railroad corporations here. It is not for us, without further evidence, to decide that it cannot carry out its obligations.

A little time will decide the question.

It will be time enough to call off everything, should the company fail to carry out its obligations. Let us not anticipate, or be too ready to predict failure. All railroad corporations organized within the law are on an equal footing.

Going further into particulars of the cause, we find that plaintiff urges that defendant proposes to retain joint control with the city of the public belt, and that, for that reason, Ordinance 1615 is illegal. Plaintiff evidently apprehends that this joint control of the belt will divest the city of the control and management which it should have of a great public belt.

To some extent it may be that the position finds some support among the many conditions covered by the ordinance in question. But a close investigation of the respective rights of the parties has not resulted

in convincing us that there is any great danger to the city's interest.

Railway affairs are to be in the hands of railway officials; governmental affairs, in those of the municipality. In this point of view, there will be no joint control.

Arguendo, it is urged by plaintiff that the ordinance (1615) contains conditions which affirm the city's right of ownership of the belt road; that others negative the right of any ownership in the city; that there is objectionable inconsistency in the terms of the ordinance.

Having examined the ordinance attentively, we have not found that, under proper interpretation of the grant to defendant, there are conditions which will prevent the city from enjoying the right of ownership she retains over the tracks in question; nor have we found the damaging inconsistencies charged, as relates to conditions laid down in the ordinance.

The argument for plaintiff, further, is that not only the city will be hampered in her ownership of this property, but that she perpetually parts with a right with which she should not part.

Still, we see, by the terms of the ordinance, that the city retains the right, absolutely, of granting to other railroads the use of the tracks. She retains the right to operate a public belt road in the interest of the public.

As relates to this perpetual grant urged by plaintiff, we can only say, further, that it can only be perpetual to the extent that the defendant company will comply with its obligations, which will be onerous enough, without seeking to exercise right of ownership and interference to which it will not be entitled.

It cannot be permitted to misuse a grant, or to run its roads without regard to the public.

There is no reason to infer that it will be permitted to run, like the brook, forever, without the least regard to condition.

Stipulations and conditions cannot be disregarded by either party, and this, it seems to us, will obtain desired protection at all times, and divests "perpetuity" of the odium it gives rise to, when the right is uncontrolled and uncontrollable by no one save the grantee of the use.

Among other conditions of ownership, the arbitration clause of the ordinance is referred to by plaintiff with great force.

We understand that defendant company, as well as the city of New Orleans, can call for the appointment of arbitrators to settle controversies regarding the use of the tracks and appurtenances, or as relates to costs of maintenance and construction, and regarding other differences which may arise.

We take it that these arbitrators are to find the facts, and determine controversies relating exclusively to facts, and none other. We hold, with reference to facts and law, that none of the parties are bound to an extent that disables them from having recourse to the courts. We do not think a municipality can bind itself to submit controversies to arbitration, and renounce all right to have them reviewed, however unjust or wrong they may be. To the extent before stated, we are willing to go, but no further.

The only purpose in matter of appointment of arbitrators by any two of the parties in interest that may disagree, we take it, is to facilitate traffic in the interest of all concerned.

Another of the conditions complained of by plaintiff as interfering with the city's control is that which requires other companies desiring to use the belt to pay an amount equal to the sum expended by the defendant, and to be expended, in extending and improving the belt track.

Necessarily, defendant will keep up its tracks. Another company coming in for joint use shall receive as much consideration as the defendant receives. The amount paid by the new company on the complete belt will be expended in extending the line of belt, in the use of which it will have equal interest with the other companies. They will be on an equal footing, and each is to have similar privileges, and subject to the same authority.

The companies coming in as users, after the defendant, will not have to pay a larger amount than defendant. This fund is to be expended in the interest of all concerned—for railroad belt and in public interest.

The expenses of the belt road to be constructed by the defendant railroad, it is provided, should not be excessive. There is a

check to extravagant expenditure through the railroad belt commission, of which the mayor of the city is the chairman.

Another railroad admitted to the use of the complete belt, on the same footing as defendant, will have to pay an amount equal to that found by this belt commission to have been properly expended by the defendant.

In this we find nothing arbitrary or unjust, after all. It becomes a joint venture, to which all contribute equally, and which all are to enjoy on equal terms.

But plaintiff takes the broad ground that the city is absolutely without right to grant the right of way. This is more far-reaching than the other grounds urged by plaintiff.

This position is based upon the dedication to public use for a belt, made by the city, under conditions set forth in the ordinances, of the right of way on the river front. This view, we think, as relates to the particular tracks at or near Audubon Park, is fully answered by the decision of this court in City of New Orleans v. Steinhardt, 52 La. Ann. 1043, 27 South. 586.

The city has it in her power to change the means of operating a railway, in case of necessity, in matter of a dedication, if it be deemed to public interest to make a change. Canal & C. R. Co. v. R. Co., 44 La. Ann. 485, 10 South. 888.

Here it seems that the city is not in a financial condition to expend the large amount required for a belt. She has adopted a method of belting which is to fall under her control, if she chooses, after a short time, by adopting methods which will secure the needed improvement and service.

The question raised by plaintiff against a right of way to railroads operated beyond the city has been considered and decided by this court in East La. R. Co. v. New Orleans, 46 La. Ann. 526, 15 South. 157, in which it was held specifically that the city has the power to grant a right of way in such a case.

The view clearly expressed in this last-cited case met with favorable consideration in New Orleans & Lake Railroad Company v. Watkins, 48 La. Ann. 1550, 21 South. 199.

The decisions must have been well known to those who interest themselves in industrial movements. They must also have been known to the members of the Legislature. It was a matter of moment, not to be lightly dealt with. It is fair to presume, if the views expressed in these decisions had not met with the approval of the Legislature, that it would have expressed its disapproval in a statute of no uncertain meaning. But, on the contrary, the statute adopted after the decisions above cited had been rendered evidently had reference to the prior ruling of the court, and, to a great extent, effect was given to the interpretations of these decisions by the language of the statute. See Act No. 131, p. 227, of 1902.

The authority of the city to grant rights of way, reasonably, received direct sanction by the terms of this just-cited act. We have scanned this statute, and did not find an expression which could be construed as denying to the city the power of local legislation in matter of a public belt.

But it is said by plaintiff, regarding this act, that, if it undertakes to grant the council the right to give away to railroads, it vitiates article 58 of the Constitution, which prohibits such gifts.

To arrive at the conclusion suggested by the argument of plaintiff, we have to take the agreement arrived at by the council with defendant corporation as one covering a gift or grant, pure and simple.

That is not our view. The city needs a public belt. To obtain such a belt, she entered into a contract with defendant, whereby not one road, but a number of roads, may be admitted on this belt on equal terms, in the public interest. These railroads may find it to their advantage to use these belts. There is nothing about the use in the nature of a gift.

It is, on the contrary, a contract in which the city finds it to her interest to permit defendant to use certain tracks and grounds; and defendant, on the other hand, finds it to its interest to furnish additional and much-needed means of transportation to and from the city. But plaintiff specially points to the law which requires advertisement of grants of use for sale.

To invite competition of railways would be doing a useless thing. These ships of the plain act separately and successively, at long intervals. They seldom present themselves at the same time for similar privilege and right of way, as to bid for the same right. The most that can be done is to transact

with the first on the best terms possible, and see that others can be admitted with equal rights and on the same terms. This the law sanctions.

Plaintiff's contention, next in order, is that part of the territory on the river front, over which defendant's grant lays, is exclusively within the control of the board of commissioners of the port of New Orleans, and that the city was without authority to grant the right it undertook to grant to defendant.

The city, in the ordinance, grants a legal right of way. We do not think there is enough in this objection to justify us in annulling the ordinance.

The city has not bound itself hard and fast, for a stated consideration, to furnish this right of way. She transferred the right she was authorized to transfer; that is, the right she owns and controls. If she did not have the authority, she did not transfer the right. As between the city and defendant, she is bound, in good faith, to carry out the terms of the ordinance.

We leave the question relating to tracks along the river front, to take up for consideration the claim which defendant sets up to the use of the grounds on Basin street, leading to and fronting Canal street—an important issue of the case. There was an open space, known years ago as the "Commons," or open lowlands, lying in the rear of Rampart street, and extending to Claiborne street. The title is traced back to the United States government. The United States government acquired it by the treaty of cession made by France. Afterward the space occupied by Basin street was donated by the United States government to the city of New Orleans, less a strip of land reserved by the general government for the New Orleans Navigation Company.

An ancient plan shows that it was laid out as the "Rue et Promenade de Basin," corresponding with the "Rue et Promenade de Canal," extending at right angle to Canal street. Prior to 1838 an attempt was made to open a canal through it, as intended by the grant of the general government, from the Old Basin to Canal street, and Canal street to the river.

This digging up of a canal was prevented by the citizens, who feared that the throwing up of so much earth, and leading the water from the river to the Carondelet Canal, would endanger public health. The canal project to the Mississippi was abandoned.

We are informed by the decision cited infra that subsequently (i. e., in 1842) all the rights of the New Orleans Navigation Company reserved to this space, as donated by the general government, before referred to, were seized and adjudicated to the city.

From that time it has been considered as dedicated to public use. None the less this court decided that, with reference to these very grounds, the city has a supervision and control. Tilton v. R. Co., 35 La. Ann. 1063.

The court in this case said that there can be no doubt that from the beginning the whole of the space was dedicated to public use, and yet held, as relates to this property, that the city can concede the right of way through her streets, public places, and other property—of course, for a consideration.

The use of the neutral ground on this street has never been free and open as promenade grounds. A railroad at this time has its bed along the line, and there is a small, ancient house—rather, cabin—at the head of the street, suggestive of the remote past.

A number of decisions of this court have recognized the city's right to grant rights of way over public places to railroads for a consideration.

In addition, in 1902, Act No. 131, p. 227, of the legislative session, enacted that the city should have the power to make disposition of property no longer necessary for public use. The power clothing the city authorities with discretion will not be interfered with unless some abuse is evident.

The property owners along the street have not complained. The complaint is particularly against the ordinance, attacked on the ground that the city is without right to authorize the use of a public place for a passenger railroad station. The station is sought to be differenced from the railroad itself. A passenger station is as important as a railroad, in railroad enterprises. We think of no good reason in this instance leading to the conclusion which admits the right to run a railroad on the neutral ground, and denies it to a passenger station at the end of the street, as here proposed.

The question of railroad passenger stations is always considered in the same connection

with railroads, and such stations are sanctioned, unless they become a nuisance or cause damage. Neither appears in this case. On the contrary, it is agreed that a large, commodious depot shall be built in place of the small house before referred to, at a cost not less than $150,000.

We come to the bridge question over the New Basin Canal. An examination into the powers of the canal board has not resulted in convincing us that the city is without power to authorize a railroad to pass over this canal. We have not found that this board has in its power to forestall the city in matter of any bridge she may deem proper to authorize.

But be this as it may, as between plaintiff and defendant, it does not appear to us that the city has exceeded its authority in granting to defendant the use of a bridge over this basin.

The city has no guaranty that the defendant will ever perform the work, is another position of plaintiff.

The grant was made on condition that the work would be done before July, 1904. We have no reason to hold that an attempt will be made to fasten an incumbrance on the city, which no authority will be able to shake off.

The ordinance expressly looks to the performance of the whole work, from end to end. The testimony certainly binds defendant to extend its lines, within the time mentioned, to distant places, and to make it part of the system of the railroad repeatedly mentioned in argument and in testimony. It is, as we take it, to be a continuous and interstate road, and a railway to facilitate relations and multiply exchanges between places. We have found no ground for inferring that the grantees will do less than they held out when they obtained the grant. Our conclusions are based on the ground that this is to be a permanent road, in public interest.

The time, in matter of completing the whole work, is an absolute condition.

It is from that point of view that the ordinance has a binding force. The theory of our decision rests entirely upon the ownership which we think remains in the city, and the fact that the improvements are to be in public use, as before mentioned. It does not for an instant occur to us that the city, under this ordinance, is ever at any time to occupy a secondary position. She owns and she is to direct and control in a short time.

Returning for a moment to consider specially the objection of plaintiff, urged on the ground that under the ordinance all railroads —even the railroad by which the 2½ miles of public tracks was built, and which now belongs to the city, as part of the belt system— are to be debarred from using any part of the tracks from the upper parish line to Henderson street, unless they can pay about $330,000 for the privilege.

Defendant's counsel takes issue with plaintiff on this point, and says that the intention was not restricted, as plaintiff contends.

We accept defendant's interpretation as entirely correct. There must be no dead stop in the interest of any one. The use is open to all from the upper parish line to Henderson street, on the terms which the city alone has the authority to determine and regulate. From that point of view, plaintiff's objection must fall.

With reference to the police power—another issue of the case—we will dispose of the question with the statement that the city did not part with its police power; that is, that police power of which it is not within the authority of a municipality to divest itself.

With reference to belting cars—another issue which enters into the case—the city has not divested herself of all authority. The defendant agrees to belt cars, not on its own terms, and as it fancies, nor forever. The limit is fixed by the words of the ordinance relating to belting.

The contention is presented that the ordinance can be of no effect without the mayor's signature, which he declines to attach to the ordinance.

We think that a grant carried over the mayor's veto becomes complete, if passed by the required number of votes.

This is always the effect of a two-third vote in legislative assemblies. We have been furnished with no law and no decisions requiring his signature when, as in this case, he declines to sign.

On appeal, the authority of plaintiff to bring this suit was not questioned. We think it was proper for the mayor to bring the issues before the court for decision—indeed, it was his duty, as he entertained doubts regarding its legality.

We deem it proper to say here, before closing, that the management must go to those directly in charge, to the extent of their respective interests. They must face the facts —overcome obstacles. In order that this belt may be successful, they should not be placed in a position to have to deal with enterprise at secondhand and through the perceptions of others, as relates to active management. Confidence must go somewhere—subject, however, to reasonable checks or restraints, in order that superior authority may have it in its power to prevent abuse and wrong.

To be successful and satisfactory, there should be honor pervading the enterprise, and a disposition to fair dealings on the one hand, and justice and equity on the part of the municipality on the other. With these, the ordinance is ample. Without them, any ordinance would meet with some trouble in its enforcement. Under any circumstances here, there are conditions that cannot be disregarded.

It is clearly expressed that all railroads paying the same as defendant—not more, not less —must be admitted on equal terms with defendant, and, furthermore, to the city remains the power to enforce justice to herself, as well as to all other interests concerned.

From the point of view before expressed, and with the limitations stated, we have decided to affirm the judgment.

The law and the evidence are with defendant, and for that reason the judgment is affirmed.

NICHOLLS, C. J., and BLANCHARD, J., dissent.

### On Application for Rehearing.

(June 26, 1903.)

BREAUX, J. After having obtained the court's consent, counsel for the Shreveport & Red River Valley Railroad Company filed a brief as amici curiæ on behalf of that road, to which brief we have given careful consideration.

The extent of the council's authority over the belt road from the upper line of the city, when completed to Henderson street, gives rise to the question involved.

This is not, with us, a new point of controversy. It has been argued at the bar and discussed by the court, and the conclusion was arrived at originally that the ordinance (1615) has application to a road to Clouet street, and not to a road to Henderson street.

The following are our reasons for thus concluding:

The ordinance provides, as relates to the road to Clouet street, "Every other company which shall contribute as aforesaid to the completion of the belt system, shall have the right to use the said completed belt." Subdivision "d" of paragraph 10 of section 2 of the ordinance.

This refers, evidently, to all paragraphs of the ordinance, and reads into each paragraph, "the road to Clouet street," as the objective point after leaving Henderson street southward, and payment of the amount in question, of about $330,000, is not a condition of the grant from the upper parish line to Henderson street.

In our view, the other words of the ordinance do not restrict the meaning of the ordinance as before expressed. Section 2 of the ordinance provides "that said company shall construct * * * the double track as now projected from the ends of the rails in the upper side of Audubon Park to Henderson street, with all necessary and convenient cross-overs, switches and spur tracks."

This surely does not have the effect of limiting or restricting the use of the track from the upper line of the city to Henderson street, nor does it prevent other grants by the city of use from the upper line of the city to Henderson street. The other paragraphs of the ordinance relate to the right of way, to the title of the belt road, to the management of the belt road, but do not refer to the belt road to Henderson street as a "completed road," for which other roads must pay $330,000 for the use.

This is the construction placed upon the ordinance by us.

During oral argument, propositions were argued from that point of view. In the brief, admissions were directly made. Since, the defendants have accepted our interpretation. They have submitted a written appearance to that effect, as the following shows:

"Now comes the New Orleans & San Francisco Railroad Company, defendant and appellee herein, and hereby judicially repudi-

ates the position taken by the plaintiff to the effect that under paragraph 10 of section 2 of Ordinance No. 1615, N. C. S., the city of New Orleans has debarred herself from granting to any other railroad company a right of way over so much of the belt tracks on the river front as she may choose, except upon the condition that such railroad company should pay for such right an amount equal to the sum expended by the New Orleans & San Francisco Railroad Company in constructing the piece of track from the upper side of Audubon Park to Clouet street, and hereby judicially admits and declares that under the terms of said ordinance No. 1615, N. C. S., the city of New Orleans has full power to grant to any railroad company a right of way over the belt tracks from the upper city limits to Henderson street, in whole or in part, for any consideration or condition she may see fit to impose. And defendant further avers and admits that the written judicial declaration is made for the purpose of avoiding and combating the application for rehearing in this cause, and the application of the Shreveport & Red River Valley Railroad Company to have the decree of the lower court amended. [Signed] Farrar, Jonas & Kruttschnitt, Attys. for New Orleans & San Francisco Railroad Company."

The meaning of the paragraph does not include a part of the construction of the railroad, in presence of the fact that the whole is specially referred to; that is, the completed road. There is no question here of the whole including all of its parts, for the reason that the ordinance, to Henderson street from the north, is an independent proposition.

When the work will reach Clouet street, other conditions will arise than those which will arise when the work reaches Henderson street. To Henderson street, the ordinance does not require the payment of $330,000 (or about) in question. To Clouet street, or work contemplated to Clouet street, it does.

Questions regarding a future belt to Clouet street are not at all before us. We were called upon to determine whether payment could be required from other roads of the amount before mentioned, or for work to Henderson street. It surely is manifest by this time that we have found no good reason to hold that the city of New Orleans is barred by the ordinance in question from granting by ordinance to other roads than the defendant road the same right to Henderson street as that granted to defendant road to Henderson street.

The amici curiæ have, on behalf of their client, the Shreveport & Red River Valley Railroad Company, suggested as follows, quoting from their brief:

"The roadbed of this company (the Shreveport & Red River Valley Railroad Company) being entirely within the state of Louisiana, if it is required to pay the sum of $330,000, or an amount necessarily expended in the construction of the belt track down to Henderson street, it would be practically denied the benefit of this belt system, and an entrance into the city of New Orleans. So, likewise, would every other road, chartered by and built within the state, be practically prohibited from using this belt with some vast system of railway of this city."

The inquiry, to the extent that it relates to the road entirely within the state of Louisiana, has not heretofore been suggested. As it grows out of, and is closely and even inseparably connected with, other issues of the case, we will say that, from the upper city limits to Henderson street, the city is not prevented, under the laws and under form required, from granting the use of the contemplated belt on the terms and conditions heretofore mentioned by us in our original opinion. With this statement, we leave the subject in regard to which the amici curiæ addressed inquiry.

The right of way in question, over which it is proposed to operate a belt road, has been used in laying the track a distance of about two miles. This track is not utilized at all. No car, for belting purposes or any other purpose, runs over it. The record discloses that it is in a condition of disuse—it has fallen into desuetude.

The track at this point and the belt were acquired in order to establish a belt road. Whatever dedication was made in the contract entered into with the Illinois Central Railroad Company was with the view of dedicating a road for a public belt.

Since 1889 no public belt has been built, and no attempt has been made in that direc-

tion, except the two miles of road before mentioned, and not used. It happened that in transacting with the Illinois Central Railroad Company the city obtained this railway as a consideration of certain grants made to this road.

The council conceived the idea of utilizing this grant, and adopted Ordinance No. 1615 to that end.

In the first ordinance (No. 15,080) a railroad belt was the purpose; in the second (No. 1615), a railroad belt is also the purpose—with this difference: that the means of accomplishing the purpose, as set forth in the first ordinance, are changed. This, we think, the council had authority to do. This question has, to some extent, been considered heretofore. The nature of the dedication was especially defined in the decision to which we refer. With reference to the officers of the city, the court said that it "realized that they were vested with authority to open streets and to widen them, and to permit the use of them for railroads"; that "it would be to the interest of the public at large to provide a means along this way, whereby imports and exports might be transferred at ship's side."

These officers used their power to obtain better facilities "for handling freight intended for foreign and local commerce." See City v. Steinhardt, 52 La. Ann. 1043, 27 South. 586.

The city council were not unalterably and forever bound to the first ordinance (No. 15,-080) in such a way that no other ordinance to the end looked for in it could be passed, looking to the result which it seems the first ordinance had failed to bring about. Under a prohibitive construction, preventing the least change in the means of using dedicated property, the number of cars passing through different places in the city would be much less. There would be more walking and less riding, which, after all, is perhaps not a bad idea for those who can afford to walk.

After a street has been dedicated—after the city has given a grant to one company to run its road through that street—the city can grant the use of a part of a track to another company, upon compensation. Railroad v. Railroad, 44 La. Ann. 485, 10 South. 888.

With reference to the old ordinance (No. 15,080), it cannot have the effect of depriv-

ing succeeding councils of the power of legislating so as to obtain the purpose intended from the first. If the city has the authority to construct a belt line—a right, in so far as the city is concerned, no one seems to question—it has the right, by necessary implication, of adopting other and additional means to carry out the right. They are left, to some extent, to means adapted to ends; and to ends, to the extent proposed, "they are not confined to one mode of operation." Dillon on Municipal Corporations (3d Ed.) vol. 1, § 91.

As relates to the provision for arbitrating differences in management:

The arbitration clause is intended, we take it, to be reasonably executed, and no interest should be heard to hinder the city from exercising sovereign control to that end. This is said only to the extent that it is necessary for us to pass upon the question of the reasonableness or unreasonableness of the ordinance. The policy of this clause is not before us for decision. It belongs to a distinct branch of the government. We are only to determine whether or not an ordinance is reasonable or unreasonable.

From that point of view, it does not appear to us that an ordinance is unreasonable that makes provision for arbitration to the extent and to the limit we have before mentioned.

With reference to security limit, and those clauses usually inserted in contracts to make things safe and to insure performance, here, again, something must be left to the discretion of the municipal branch of the government.

As relates to the precautions usually taken in such matters, we are not to substitute our judgment to that of others whose duty it is to see that the interest in their charge is fully protected. We are not writing an ordinance, or accepting or rejecting an instrument submitted to our approval. Presented to us as an ordinance, we do not think it is fatally defective, as relates to the usual guaranty of performance. It is not, in our view, illegal on that ground.

An ordinance is not to be pronounced unreasonable because special guaranty was not required to make performance certain.

The general rule is that, where legislative or discretionary powers are conferred upon

municipal corporations, courts will not interfere, unless in the exercise of such discretion there is fraud, manifest oppression, or gross abuse. Am. & Eng. Ency. of Law (2d Ed.) vol. 20, p. 1229.

Again, "The courts will not restrain, control, or coerce the acts of a municipal corporation on the ground that they are merely unwise, extravagant, or erroneous, or a mistake of judgment." Idem.

This ground is sustained in well-considered decisions. In Wells v. Mayor, 43 Ga. 67, with reference to the authority of the municipal corporation of the city of Atlanta, the court held that the mayor and council are the representatives of the people. The court saw "nothing in the loose charges made of fraud and corruption. * * * They are entirely too vague to justify any serious consideration by the court. Whether the contract be a wise one, or not, are matters exclusively within the cognizance of the body clothed by the charter with the exercise of the powers of the city. It would be an improper interference by the courts with the rights of the city for them to undertake to judge of the expediency of the contract. If its provisions were so shockingly outrageous as to furnish a strong presumption of fraud, that might be an element for consideration, but it would only be proper as a proof of fraud in connection with other proofs for the courts to inquire at all into the propriety of the contract."

In the case before us for decision, there is no fraud or corruption charged—none shown.

"The presumption is in favor of the propriety and good faith of their conduct, and the complainant must make out a clear case of willful oppression, to obtain relief from the court." Citing in support of the text Police Jury of West Baton Rouge v. Bozman, 11 La. Ann. 94; Avery v. Police Jury of Iberville, 12 La. Ann. 554.

The court further says in the cited case:

"This presumption is founded in reason, as well as sustained by law. For the trustees of the town are chosen by the citizens for the express purpose of regulating the streets, and have better means of judging concerning the wisdom of a proposed improvement than a court is likely to obtain from the mere opinions of a witness. Their interests are generally identical with those of the property holders, and the public, and they have no motive to act oppressively or unjustly." Reynolds v. Shreveport, 13 La. Ann. 429.

In a case in another jurisdiction upon the subject of the authority of a city, the court said:

"The case must be a very clear one, and the subterfuge very plain, before that discretion can be regarded as having been exceeded so as to show an excess of power under a pretense of keeping within it. It is not the business of courts to act as city regulators, and, unless the authority of the representatives of the citizens has been exceeded, their action cannot be interfered with merely because it may not seem to other persons to be as wise as it might be." Torrent v. Muskegon, 47 Mich. 117, 10 N. W. 132, 41 Am. Rep. 715.

Passenger stations are considered part of the system of railroads. The authorities upon the subject of railroads have not, so far as our research has gone, established a great difference between the grant of a right of way to a railroad and the grant of a right to occupy a public place for a depot. One is inseparable from the other. If a council has the right to grant the right of way to a railroad over the neutral ground of a street, it has the right to grant a place for a passenger station. There might be a case arise in which there was unreasonableness or oppression in the selection made.

"Legislative grant of power prevents such structures from being a nuisance." Dillon on Municipal Corporations (4th Ed.) §§ 383, 660.

It would then devolve upon the court to set aside and declare the grant null. If there is anything unreasonable or oppressive in this ordinance, as relates to the station on Basin street, it is not made evident by the testimony.

We concede that a passenger station is more cumbersome to a city than a railroad line. It is more of the nature of private property of the road. None the less it is used for the convenience and comfort of the public, and falls within the rules applying to railroads. The right to acquire the use of land for passenger stations is governed by the same law as when the purpose is to acquire right of way for a railroad.

The right of expropriation is the same on

depots as for the road itself. Elliott, vol. 3, § 960, and other authorities there cited. "Railroads have the right to expropriate lands for the depots." 1 Wood, p. 653.

They are on the same plane with railroads, subject to the exception before mentioned; that is, they shall not injure. They are to be considered as part of the railroad.

From that point of view, the rights of the parties, as relates to this station, are to be considered in the same light as railroads.

The streets and neutral grounds are owned by the public, and are not to be given away under any circumstances. There are neutral grounds used by railroads. The city authorities, under the law's sanction, have granted the right on the ground that it was an improvement—"a street improvement"; "a physical improvement," "open to the public use"; "a new and improved mode of riding and carrying."

We are not responsible for these definitions in decisions in other jurisdictions. They only serve to illustrate the idea of improvement, with which we are not concerned. If an error has been committed, and too much was granted by the council to defendant, it is not made evident by the testimony.

We have special issues before us regarding a particular street. It serves the purpose of the discussion to excerpt the following from plaintiff's petition:

"That said neutral ground of Basin street is dedicated to particular public use, as a neutral ground and as a part of Basin street, and that the council of the city of New Orleans is without power or authority to grant to the New Orleans and San Francisco Railroad Company, or any other railroad company, the right to construct, maintain, and operate a passenger depot thereon, or the right to occupy or use for any private purpose, or in any exclusive way or manner, said neutral ground; that said council is without power or authority to change the destination of said neutral ground from the particular public use to which it has heretofore been dedicated, except by a two-thirds vote of the members thereof, to some other public use."

Plaintiff, in his petition, denies the council's authority to give away the right, and sets forth different grounds in support of his denial. We agree with plaintiff, as expressed in his petition, that the council has no right to give anything. We also agree with plaintiff that the right cannot be granted for a private purpose. But our research has not resulted in our finding any well-considered decision in which it was held that such an enterprise as here mentioned is a private and not a public use; and therefore we are unable to agree with plaintiff's conclusion, based upon the idea that defendant's is a private enterprise, such as mentioned in Act No. 108, p. 167 of 1902.

Should we grant the mayor's contention that it is "private use," our conclusions would have to be different, but law and authority constrain us to hold that it is "public use."

The petition (that portion quoted) alleges that a change of the destination of the property may be made upon a two-thirds vote. The petition, in another part, also alleges that the ordinance was adopted by a two-thirds vote. We do not attach the greatest importance to the allegation, for, after all, the issue is one of right vel non. No question, however, that under this allegation there is a possibility of making some change in use of property, against which change, in argument, plaintiff contends.

It cannot be under section 87 of the charter, as amended by Act No. 108, p. 167, of 1902, which requires grants to be advertised, says plaintiff; but, on the contrary, his contention is that Ordinance 1615 falls within the purview of section 86 of the charter. Plaintiff further contends that railroad companies are, as to their property, income, and profits, private corporations, and as such they conduct private business, within the meaning of section 86 of the charter, as amended by Act No. 108, p. 165, of 1902.

We will not go over that ground again, and content ourselves with referring to article 272 of the Constitution, ordaining that railways are public, and the companies common carriers, while section 86 of the act of 1902 relates exclusively to the conduct of private business.

A careful consideration of Act 108 of 1902 has led to the conclusion that neither section 86 nor section 87 could have application to an interstate road.

This being our conclusion regarding the

law cited supra, we have been led to inquire whether the defendant had any standing as a corporation under any law.

Section 689 of the Revised Statutes of 1876 certainly has the appearance of the commencement of authority in the council, as it reads: "No railroad * * * shall be constructed through the streets * * * without the consent of the municipal council."

With reference to this "consent," as expressed in the cited section, this court said in Railroad v. Watkins, 48 La. Ann. 1556, 21 South. 199, "Consent only was necessary to grant the privilege of a right of way to a railroad company beyond the city limits;" citing the article in question.

Article No. 131, p. 227, of 1902, grants to the council "the power to authorize the use of streets."

In Railroad Company v. City, 46 La. Ann. 529, 15 South. 157, Justice McEnery, organ of the court, said: "As the road of plaintiff is not a street railway, the city council had the power to grant the franchise."

Further in the same decision:

"The city of New Orleans can, as a matter of right, refuse to grant the authority for a passage through its streets of a railroad. It can also demand a price for the privilege. But it can also, as a matter of right, if it deems the exercise of the power reasonable and proper, grant the right of way to a railroad extending its lines into other territory, without a compensation in money, but other considerations." Railroad Co. v. City, 46 La. Ann. 527, 15 South. 157.

This decision was quoted from approvingly and affirmed in Railroad Co. v. Watkins, 48 La. Ann. 1550, 21 South. 199.

An ordinance creating contractual obligations is to go through the same process, in matter of its adoption, as others. After it has been finally passed over the veto, it becomes a law. The required vote puts an end to its defect on the ground of want of signature.

It is not because an ordinance has the characteristic of a contract that it must more particularly be signed. This is not the case of an ordinary contract between the chief executive of the city and one with whom he enters into a contract, but a public ordinance, adopted as all others are adopted.

Rehearing denied.