PROVOSTY, J.
The authorities of the city of New Orleans conceived the plan of a public belt railroad system that should pass along the river front and encircle the city, connecting ail the trunk lines of railroad, and reaching by means of switches every wharf, freight depot, and important industry. Unfortunately the city had not the funds wherewith to carry out the project. A beginning was made, however, by entering into a contract with the Illinois Central Railroad under which, in consideration of certain concessions, that railroad constructed two miles of the part of the line along the river front, namely, from the upper limit of the city down to the upper boundary of Audubon Park. The city then passed an or *780 dinance creating a hoard of commissioners to have charge and control of the proposed belt railroad. The ordinance bears date August 7, 1900.
About two years later, there was passed an ordinance known as the Frisco Ordinance or Ordinance 1,615, N. O. S. This ordinance embodied a scheme for the continuation of the construction of the projected belt railroad of which the Illinois Central had already constructed two miles. The scheme was that the St. Louis & San Francisco Railroad — or the Frisco, as popularly called — should construct, at its own expense, five miles of the road, continuing down to Henderson street the two miles already constructed by the Illinois Central Railroad, in consideration of which should have the use •of the belt, with the right to operate thereon, its own locomotives, cars and equipment; that an account should be kept of this expense; and that every railroad, on contributing an amount at least equal, should have the right to use the belt in the same way. The ordinance made careful provision for the mode of operating the belt, both while in course of construction and when completed. The full text of the part having reference to the belt railroad is given in the margin,[1]
This ordinance was passed over the veto of the then mayor of the city, Mr. Capdevielle, who at once brought, suit to annul it
At certain places along the river front, the belt road would have to pass through territory within the limits of the port of the city, under the jurisdiction of the board of commissioners of the port, and permission for it to pass had been obtained from said board; but the permission had been granted only under the express condition that it should “remain in force only so long as the public railroad is operated and controlled by the board of commissioners of the public belt railroad in accordance with the provisions of the ordinance creating that commission.
Now, whereas the ordinance creating said belt railroad commission provided that:
“The management and control of the Public Belt Railroad shall be separate and distinct from that of any railroad entering New Orleans, and shall remain forever the property of the city of New Orleans, and no employé, director or officer of any state'or interstate railroad shall be employed by or allowed to act as director, commissioner or manager of the Public Belt Railroad’’
—the said Frisco brdinance allowed the railroads to participate in considerable degree in the operating of the belt. The board *782 of commissioners of the port, or dock board, considered this to be a violation of the express condition upon which alone it had granted permission to the belt road to pass through the territory of the port, and therefore it promptly brought suit to enjoin the Frisco from carrying out the ordinance “in so far as it authorizes the construction and maintenance of a railroad on the wharves or landings of the port of New Orleans.”
The said suits, the Capdevielle suit and this dock board suit, came to this court. By two judgments of this court — one of which, that in the Capdevielle suit, became final on June 3, 1903, and the other of which, that in the dock board suit, became final on June 24, 1904 (Capdevielle, Mayor, v. New Orleans & S. F. R. Co., 110 La. 904, 34 South. 868; Board of Commissioners v. N. O. & S. F. R. R. Co., 112 La. 1011, 36 South. 837)—the demand of the Capdevielle suit was rejected and that of the dock board suit was maintained. The court took the view that the only respect in which the subject-matter of the ordinance was not within the authority of the city was in the belt *784 road traversing the territory of the port, and that on that point, the port authorities alone had a right to complain.
Over two months after the termination of the Capdevielle suit, but while the dock board suit was still pending, the ordinance which forms the subject-matter of the-present suit was adopted. We are concerned in this suit only with that part of it relating to the belt railroad, which we give in the margin.[2]
It is one of the fifteen sections of the ordinance which is very lengthy, and very broad in its scope, embracing the entire municipal legislation necessary for making provision for the entry of the defendant railroad (then in course of construction) into New Orleans, granting the necessary rights of way over streets, and making concessions and grants as inducements to the defendant railroad to come.
As we shall have occasion hereafter to refer with particularity to what is here given in the margin we will content ourselves at present with the general statement that it grants to the defendant the use of the belt road from the upper city limits to Hender *786 son street In consideration of $50,000 to be paid, and provided that, in case the Frisco fails without legal excuse to construct the five miles of road called for by its contract, the defendant railroad is to construct same on the same terms and conditions, succeeding to all the rights and obligations of the Frisco, and its doing the work is to be in lieu of paying the $50,000; that as security for the performance of this obligation the defendant railroad is to deposit in the hands of the fiscal agent of the city on July 1, 1904, good bonds, or other securities, to the amount of $50,000. In the event the Frisco should construct only a portion of the five miles of road the defendant railroad is to have the use of the two miles constructed and of whatever portion of the five miles might be thus constructed, and instead of paying the full $50,-000 is to make payment in proportion.
The defendant made formal acceptance of the ordinance, thereby converting it into a contract.
When the adverse decision in the dock board suit was rendered, the Frisco and the city looked upon it as having put an end *788 to the schemes by which the construction of the belt road was to be effected by means of contributions from the railroads; and the defendant appeared to have taken the same view, for it remained quiescent, gave no sign of its intending to take any further interest in the matter, for 17 months — until November 10, 1905. It then deposited $50,-000 of bonds with one of the fiscal agents of the city as a guarantee for the carrying out of the contract, and notified the mayor and the city council of the deposit having been made.
But the city had, in the meantime, in October 1904, IS months before the date of the deposit, passed an ordinance reorganizing the belt road commission, and making adequate financial and other provision for the construction and operation of the belt, and repealing all conflicting ordinances. Against that action on the part of the city, defendant had made no protest; although defendant could not but have known of it, since the measure had attracted a great deal of attention; in fact, had been looked upon as so important as to constitute an epoch in the *790 industrial life of the city, and had been celebrated as such by a mass meeting at which speeches were made. Following defendant revival of interest in the ordinance, as shown by the making of the $50,000 deposit, fruitless conference took place between defendant’s officials and the city authorities; and then, on the 16th of May, 1906, the defendant undertook to begin the construction of the five miles of road, and the present suit was promptly instituted enjoining it from doing so.
Immediately after the injunction had been taken, the board, of commissioners of the belt railroad began the work of constructing the belt road; and the road has now been in full operation for some years.
The grounds of the injunction are:
First. That the contract with the defendant is null, because it divests the people of the city of their property without due process of law, and impairs the obligation of the city’s contract with the Illinois Central under which the two miles of road were constructed; and because it stipulates something impossible, namely, the construction upon the *792 territory of the dock board of a belt road which should be in some degree under the control of the railroads.
Second. That the contract with defendant, if ever valid, has terminated, because it was subject to suspensive conditions which can never be accomplished; that as to that part of the contract by which the defendant was to have the use of the belt road down to Henderson street on paying $50,000, the condition was that the five miles of said road from the upper boundary of Audubon Park down to Henderson street, or at least a portion thereof, should be built by the Frisco; that as to that part of the contract by which the defendant was to be under the obligation to build said five miles of road in case the Frisco failed to do so, the condition was that the failure of the Frisco to do the work should have been without legal excuse; that as to the contract as a whole the condition was that the defendant company should deposit with the fiscal agent of the city on April 1, 1904, $50,000 of bonds as a security for the fulfillment of the contract; that these conditions can never be accomplished because the Frisco has given up all idea of building said five miles of road and has done so with good legal excuse, and the 1st day of July, 1904, has been suffered by defendant to pass by without any deposit having been made.
*794 The further allegation is made that the board of commissioners of the belt railroad had already begun the construction of the ■belt road, under the provisions of the ordinance passed to that effect, when the defendant, on May 16, 1906, made the attempt to begin the work.
The defendant filed several exceptions, and, upon their being overruled, answered to the merits.
The first of the exceptions is that of res judicata. That exception is urged in bar of the contentions that the contract divested the people of the city of their property without due process of law, and impaired the obligation of the contract between the city and the Illinois Central Railroad; and that the city was without authority to enter into the contract. In support of this plea, the judgment in the suit of Capdevielle, Mayoi;, against the New Orleans & San Francisco Railroad is relied upon. The plea was properly overruled. Res judicata obtains only when the suit in which it is pleaded is between the same parties, or their successors, or assigns, as the suit in which was rendered the judgment pleaded in bar; and the defendant was not a party to the Capdevielle suit, and is not a successor or assign of any party to that suit. Whatever rights it may have, or obligations it may be under, are derived wholly from the contract involved in the instant suit, which was entered into after the Capdevielle suit had terminated, and is distinct and separate from, and independent of, the’ contract involved in that suit True, the defendant was to do the work called for by the Frisco ordinance, in case the Frisco failed to do it, but defendant was not to do this as an assign of the Frisco, or under, and by virtue of, the Frisco contract ; but exclusively under, and by virtue of, the contract involved in the instant suit. True, also, its lawyers filed a brief as amici ■curiae in the Capdevielle suit, and the court took cognizance of the brief; but the filing of a brief, even though the court take cognizance of it, does not make a person a party to a suit so as to be bound by the judgment in the suit.
The next plea is that of estoppel. This plea is founded on the fact that, in her answer to the Capdevielle suit, the city alleged that the contract with the Frisco was valid; and also on the alleged further fact that on the faith of securing from the city the ordinance whose validity is now assailed the defendant expended over $3,000,000 in constructing its road into New Orleans, and in providing terminals on the river front.
The answer to the first ground of estoppel here urged is that a party is not estopped by allegations of law unsuccessfully made in a former suit. Hornor v. McDonald, 52 La. Ann. 406, 27 South. 91; Godwin v. Newstadl, 47 La. Ann. 850, 17 South. 471; Stockmeyer v. Oerthing, 38 La. Ann. 100.
The answer to the second of the grounds of estoppel is that, in the first place, the city is not assailing the validity of the entire ordinance, but only of that part of it relating to the belt railroad; that the other parts, making valuable grants and concessions to the defendant, of which the defendant is today in the full enjoyment, are' not assailed; ’and, in the second place, that the part of the ordinance relative to the belt road spoke for itself, and that if defendant has put an erroneous interpretation upon it and chosen to act upon that interpretation, defendant has but itself to blame.
Coming to the merits, we can dispose of the first grounds of injunction, those relating to the nullity of the contract because ultra vires, and because divesting the people of the city of New Orleans of their property without due process of law, and impairing the obligation of the contract with the Illinois Central, by saying that these grounds were fully considered by this court in the *796 case of Capdevielle, Mayor of New Orleans, v. N. O. & San Francisco R. R. Co., supra, and need not be gone over again.
Tbe allegation that the board of commissioners of the belt railroad had already begun the construction of the five miles of road from the upper limit of Audubon Park down to Henderson street when defendant made its attempt to begin work on May 16, 1906, is not supported by the evidence.
The question of whether the deposit of $50,000 of bonds was or not made within the limit of time allowed for making it is unimportant. The making of this deposit was not to be a condition precedent of the coming into existence of defendant’s obligation, or right, to do the work. True, the clause stipulating it is added as a proviso; and is, therefore, in form, expressive of a condition precedent; but the manifest intention was that the defendant should be obliged to do the work whether it chose to make the deposit within the time fixed or not. It will be noticed that the stipulation that the tracks should after completion be turned over to the belt road authorities is in like manner in the form of a proviso; but no one, most assuredly, would say it was intended to be a condition precedent. Read as a whole, the ordinance manifestly means that the defendant “shall” build the five miles of tracks; “shall” complete same within one year; and “shall” furnish security. The sole effect of this deposit clause was to confer upon the city the right to require the deposit to be made; and, in default of its being made, to put an end to the contract in the manner provided by law for enforcing -the resolutory condition in commutative contracts.
We agree with plaintiff, however, that the contract was subject to a suspensive condition, and that this condition had become impossible of realization, and the contract' had, in consequence, fallen through, when plaintiff made its attempt to begin work and the injunction was taken.
The two ordinances, that in favor of tha Frisco and that in favor of defendant, embody a scheme for the construction of the belt railroad system through the agency ’of the railroads for whose use the same was intended and by means of contributions from them.
In the first of these ordinances, the city said to the Frisco : I have already two miles of my projected belt system constructed. You construct, at your own expense, but under the supervision of the board of commissioners of my belt railroad, five miles more. My said board will keep an account of your expenditure in this work and every railroad desiring to use my belt system will be required to contribute a sum equal to your said expenditure to a fund which shall be used exclusively towards completing my said belt system. In consideration of your doing this, you shall have a right of way over my said belt system for your locomotives, trains, and cars; and until the belt shall have sufficiently approached completion to justify my having an equipment of my own to operate it you shall be my agent in operating it, and in doing so, you shall observe the following regulations, etc.
In the second of the ordinances, the city said to defendant: With a view to carrying out my project of constructing a belt railroad system, I have made arrangemepts with the Frisco to prolong five miles lower down the two miles of tracks already constructed. 1 will give you a right of way over these seven miles of tracks for your locomotives, trains, and cars for $50,000; and in case the Frisco does not build said five miles of tracks, then, I make with you for the construction of same the same arrangement precisely which I have made with the Frisco. I make you this proposition only in the event the failure of the Frisco to build the *798 said tracks is without legal excuse — that is to say, that the opposition which the dock board is making to the carrying out my arrangement with the Frisco is not sustained by the court; for, as a matter of course, that opposition would be as fatal to the present proposed arrangement with you as to the same arrangement with the Frisco. Such a thing is possible, however, as that the Frisco should default with its contract after having partially executed it by constructing a part of the five miles of road; in that event you will pay for the use of the constructed part of my belt road a porportional part of the $50,000, and you will continue with the construction of the five miles of tracks on the terms and conditions agreed on. In case the five miles of tracks are built by the Frisco, and not in whole or in part by you, and you have paid the $50,000 for the use of the seven miles of tracks, then after you shall have used these seven miles of tracks for five years, and in the event the belt line is completed to Clouet street, you shall contribute $30,000 additional to the belt construction fund; and if ever you desire to use the entire belt system, or any part of it, below Henderson street, then you shall contribute to the belt construction fund an amount which, when added to the amount already paid by you will equal the expenses incurred by the Frisco in constructing the five miles of tracks.
Defendant accepted the ordinance as passed — accepted the proposition as made; hence, its contract has no greater scope than the ordinance, and is not different from it.
That the foregoing is the proposition contained in the ordinance is, we think, perfectly plain from the mere perusal of the ordinance! The parties manifestly had in contemplation the construction of a completed belt; not of a part of a belt, or detached, disconnected stretches of railroad1 tracks. The Frisco was to prolong five miles lower down the two miles of tracks already constructed; and then the work was to be continued by means of contributions from the other railroads; each of these other railroads contributing an amount equal to the cost of the construction of the five miles of tracks. All this is expressly stated in the ordinance, which obligates the Frisco to construct the five miles of tracks, and, then, for the continuation of the work of construction, provides, as follows:
“In order to provide for the completion of said belt system to Clouet street and its further continuation and construction, said public belt authorities shall have the right and power to grant the right of use of said tracks to any railroad now in, or that may hereafter come into the city of New Orleans, exacting of each of said railroads to which said right of use is granted, a sum equal to the amount expended as aforesaid by the New Orleans & San Francisco Railroad Company for construction of the belt tracks, switches, etc., as part of the public belt system of the city of New Orleans.”
The city did not profess to have any funds with which to build a foot of tracks, and did not propose to obligate herself to build a foot of tracks. She simply proposed to the Frisco the scheme contained in the ordinance, and the Frisco accepted the proposition as made. It was not the grant of the use of certain tracks already built and of other tracks which the city would build; but it was the tender of a proposition by which a belt system was to be built through the agency of the railroads and by means' of contributions from them, and the railroads were to have the use of the belt system thus constructed. The city made precisely and identically the same proposition to defendant. The only difference between the two ordinances being that in ease the Frisco had built the five miles of road, then the defendant would not have built same, and would not have had the rights and assumed the obligations of the Frisco, but would simply have had the right to use certain parts of *800 the belt tracks on making certain money payments.
The right of way which the Frisco ordinance granted to the Frisco and which defendant’s ordinance granted to defendant in case defendant succeeded to the rights and obligations of the Frisco, was not over two miles or seven miles, or any part or parts of railroad tracks; but over the “completed belt system.” True, the right of way for which defendant was to pay the $50,000 was not to extend beyond the seven miles of tracks or lower down than Henderson street; but we are not now concerned with that part of defendant’s contract. That part of defendant’s contract was to come into operation only in the event the Frisco built the five miles of road in whole or in part; and the Frisco built none whatever. We are concerned only with that part of defendant’s contract by which, on the default of the Frisco, defendant was to take up the contract of the Frisco, under the same terms and conditions, and fulfill it.
From the foregoing, and, in fact, from almost every sentence of these ordinances, it is plain that these ordinances embody a scheme for the construction of the entire belt system through the agency of the railroads and by means of contributions from them. Now, when the dock board made effective opposition to the carrying out of that scheme, these ordinances, embodying that scheme, and whose sole object was to carry it out, necessarily became a dead letter.
go evident was this, that, without one word being said on the subject, the city and the Frisco let the project drop, and defendant was equally silent and acquiescent; and so continued for seventeen months until some time after the city had made other provision for the construction pf the belt, when defendant set up the present pretensions, which wear very much the appearance of an afterthought.
If the city had allowed the defendant to go on and do the work which the Frisco was to have done, and thereby stand in place of the Frisco and be invested with all its rights and obligations, the situation would have been that the defendant would have had the right and been under the obligation to operate the belt railroad until the time had come for the Belt Railroad Commission to take charge with its own equipment for operating the belt; the defendant would have had the right to operate its locomotives, trains, and cars perpetually over the belt system; all controversies arising between defendant and the belt authorities would have had to be decided by two arbitrators, one of whom to be appointed by the defendant and the other jointly by the Belt Commission and all the other railroads using the belt. Such are the terms of the contract. And the consequence would have been that the conditions subject to which the dock board granted permission to the Belt Road authorities to operate the belt road within the limits of the port, would have been violated, and the whole belt railroad project would have become impracticable. Now, it stands to reason that this ordinance, whose sole object and purpose was to devise, propound and carry out a scheme for providing the city with a belt railroad system, cannot be so interpreted as to block not only the particular scheme thus devised and propounded but any other which the city might devise for the same purpose; and this, for all time; or, at any rate, for so long as the dock board should persist in its opposition to allowing a right of way across the territory of the port to any belt road with whose management any railroad company should have the right to interfere in any way.
At the time the Frisco ordinance was passed, the opposition of the dock board was not known or foreseen; and, in consequence, no provision was made for that contingency. *802 But when defendant’s ordinance was passed, the dock board suit was pending, and, accordingly, the clause was inserted that defendant should be obliged, or have the right, to build the five miles of road only in the event the Frisco’s failure to do the work should have been “without legal excuse.”
Defendant naturally contends that the contract resulting from its acceptance of the ordinance was absolute and unconditional.
Its learned counsel, in endeavoring to show this, argues that the contract conferred upon defendant the absolute and unconditional right to have the right of way over the belt tracks down to Henderson street upon either paying $50,000 or constructing the five miles of tracks from the upper side of Audubon Park down to Henderson street in case the Frisco did not construct them; and that inasmuch as defendant would have constructed the five miles of tracks if the city had not prevented it from doing so, the legal situation stands just as if defendant had done the work, subject only to the obligation of defendant to reimburse the city the amount which the evidence in this ease shows was expended by her in doing the work.
In opposition to the view, taken by the city and hereinabove adopted, that the ordinance embodied a scheme for the construction of the entire belt system through the agency of the railroads, and by means of contributions from them, and was conditional upon the carrying out of that scheme proving to be practicable, defendant contends that the contract was not thus indivisible, but was, on the contrary, divisible; that it contemplated that the opposition of the dock board might prevent the construction of the entire five miles of tracks, but that, at all events the part of the five miles of tracks not infringing upon the territory of the dock board should be constructed. In support of that view, and as conclusive proof of its correctness the learned counsel for defendant point to the concluding part of paragraph (c) and the whole of paragraph (d), reading as follows:
“And provided, further that said Louisiana & Navigation Company shall on July L 19M, deposit with the fiscal agent of the city of New Orleans bonds or other securities satisfactory to said fiscal agent, of the value of fifty thousand dollars, the same to be held in-escrow as security for compliance by said company with the foregoing obligation, and to be returned to said company when said company shall have built and completed said belt tracks from the upper side of Audubon Park to Henderson street; and provided, further, that in case said company shall be prevented from building said belt tracks or any portion of the same on account of the city not furnishing the right of way under the terms of Ordinance No. 1,615 N. C. S., or by causes beyond its control, then the securities deposited shall be returned to it by said fiscal agent.
“Provided, further, that nothing in this ordinance or in this section or clause shall be construed as a waiver or abandonment of the rights that the city of New Orleans now has or may hereafter have under and by virtue of the provisions of Ordinance No. 1,615 N. C. S., and provided, further, that nothing in this ordinance, section or clause shall be construed to relieve the New Orleans & San Francisco Railroad Company its successors or assigns, from any of its obligations to the city of New Orleans arising under the provisions of Ordinance No. 1,615 N. C. S.; and especially under paragraph 10 of section 2 of said ordinance it being distinctly understood and declared that the city shall be entitled to enforce all its rights under said Ordinance No. 1,615 N. C. S., precisely as if this present ordinance had not been passed at all.
“(d) That in the event the New Orleans & San Francisco Railroad Company, its successors and assigns, shall from any cause complete only a portion of the tracks from the upper side of Audubon Park to Henderson street, the Louisiana Railway & Navigation Company, its successors and assigns shall have the right to operate its own locomotives, cars and equipment over such portion of the tracks as is already built, and as may be built by the New Orleans & San Francisco Railroad Company, its successors and assigns, and for such privilege shall pay to the city of New Orleans such proportion of the sum provided in clause (a) of this paragraph as the tracks so constructed and used by said Louisiana Railway & Navigation Company bear to the whole length of the tracks from upper city limits to Henderson street.”
The learned counsel also argue that the object sought to be attained respectively by the parties was, on the part of the city, to *804 procure the construction of additional miles or belt road, and not necessarily of the entire belt road; and, on the part of defendant, to secure a means of reaching its river terminals, a site for which it had acquired at immense cost, which site is situated above Toledano street, and therefore would be reached by the belt being constructed that far down.
These contentions have already been met by what has been said hereinabove touching the nature and purpose of the ordinance. We proceed, however, to answer them more specifically, and, in doing so, shall avoid entering into unnecessary details.
In the ordinance, provision is made for three contingencies: First, that the Frisco shall construct the entire five miles of tracks down to Henderson street; second, that the Frisco shall construct a part of the five miles of tracks, and then default in its contract; third, that the Frisco shall construct no part of the five miles of tracks.
The first two of these three contingencies failed. The Frisco constructed no part of the tracks. The effect of this was to do away entirely with those phases, or aspects, of the contract designed to meet and provide for those two contingencies. The situation became the same as if no provision whatever had been made in the contract for those contingencies ; or, in other words, as if the contract had been, from the beginning, one simply •to construct the five miles of tracks on the terms and conditions specified in it.
So plain is this, that confirmation of it can hardly be necessary. If such confirmation were needed, however, it would be found in the fact that defendant itself adopted and acted upon that view. It made no effort or attempt whatever to avail itself of that phase of the contract by which it was to have certain rights in consideration of a money payment; but proceeded to make the deposit called for by paragraph (c) of the ordinance, which is the paragraph providing for the construction of the tracks in case the Frisco failed to construct any part of them. The deposit was in express terms restricted to “the terms and conditions of paragraph (e).”
Defendant understood perfectly, as no one who reads the contract as it is written can fail to understand, since the language is express and explicit, that in case the Frisco failed to build any part of the tracks, all that part of the contract by which defendant was to have certain rights in consideration of a money payment was to become a dead letter, and be superseded entirely and completely by the alternative part according to Which defendant was to step into the shoes of the Frisco for building the five miles of tracks, and be entitled to the same rights and be under the same obligations as the Frisco. The effect was that the contract with defendant ceased to call for a money payment, and became solely a contract by which, on the one hand, the defendant was to do two things, namely, first, build the belt road tracks down to Henderson street; and, secondly, operate the belt railroad until the belt authorities had provided themselves with an equipment of their own for operating the belt road; and, on the other hand in consideration of the foregoing, was to have the use of the entire belt system.
Had the defendant built the five miles of tracks in place and stead of the Frisco, and the belt authorities had sought to deny to defendant any of the rights and privileges which the Frisco would have been entitled to if it had done the work, the defendant would readily have invoked the express terms of the contract as having conferred upon it all the rights and privileges which the Frisco was to have had. And, on the other hand, if the city had sought to compel defendant to do any part of the work after the opposition of the dock board had blocked the scheme of the contract by which a belt *806 System was to be constructed of wbicb tbe defendant was to bave tbe use, tbe defendant could have answered, with the same readiness, that it had agreed to do the work in consideration of having the use of the contemplated belt system, and that inasmuch as the plan embodied in the contract by which the belt system was to be brought into existence, had wholly failed, and there was not to be a belt system, the corresponding obligation to do the work, or any part thereof, had also failed.
Defendant’s contract, as thus reduced and simplified, being the same .as that of the Frisco (in fact, that the Frisco over again, with defendant standing in place of the Frisco), was purely and simply the embodiment of the scheme by which a belt system was to be constructed through the agency of the railroads and by means of contributions from them; and it fell through and became a dead letter, like. that of the Frisco, the moment the j opposition of the dock board rendered the said scheme impossible of realization.
Another reason why that feature of the contract by which defendant was to have certain rights in consideration of a money payment could not possibly have any operation after the Frisco had abandoned the idea of building the five miles of tracks or any part thereof is that, in the nature of things, the existence of a thing is a condition precedent to its being used, or to a grant of its use.
Bealizing this, the learned counsel for defendant argue that the city bound herself to bring the tracks into existence; or, in other' words, to construct them herself, in case the Frisco did not, so that defendant might have their use; that the Frisco was merely an agent employed by the city to do the work, and that, this agent failing, the city was bound to do the work herself.
We need hardly say’ that this argument is in the teeth of the express and clear terms of the contract. The provision of the contract is that “whereas” the Frisco is to construct the five miles of tracks “therefore, under the provisions” of the contract with the Frisco, the use of the tracks is granted to defendant; and that in case the Frisco fails to construct the tracks, then defendant is to construct them in lieu of paying the $50,000. Nowhere is there even an intimation that the city will herself do the work. No one dreamed of such a thing. Such idea is, by the express terms of the ordinance and by its whole spirit, excluded.
The contention of defendant that the contract was divisible, or, in other words, that it contemplated that whatever part of the five miles of tracks the city could furnish a right of way for, should be constructed either by the Frisco or by defendant, and the defendant should have the use of it, finds support in the peculiar phraseology of paragraphs (c) and (d) hereinabove quoted. But that support proves, on close examination, to be merely apparent, and not real.
These clauses are to be understood with the qualification underlying and running through the entire ordinance, that the opposition of the dock board shall not be sustained and shall not render impracticable the scheme embodied in the ordinance and forming its whole object and purpose, to construct a complete belt system for the city through the agency of the railroads and by means of contributions from them. In other words, these clauses were intended to ’ provide for the event of the Frisco’s failing “without legal excuse” to carry out its contract.
Conclusive evidence of this is found in these clauses themselves.
Thus it will be observed that they make express reserve of the rights of the city against the Frisco; that they make this reserve repeatedly, as if by superabundant caution. This shows that these clauses presup *808 pose a default on the part of the Frisco, or, in other words, a failure “without legal excuse”; for the city would have no rights against the Frisco, and therefore nothing to reserve, and all these superabundant reservations of right would be foolish and absurd, if the failure of the Frisco was with legal excuse, or, in other words, if the Frisco was not in default.
It will be observed, again, that there never was any doubt whatever of the city’s ability to furnish all that part of the right of way down to the point at Toledano street, where the belt road would have to enter upon the territory of the dock board; and that, consequently, the stipulation of the $50,000 deposit having to be returned in case the defendant was prevented from building said belt tracks, or any portion of same, on account of the city not furnishing the right of way, could have reference to nothing else than to the inability of the city to furnish the right of way over the dock board territory.
It will be observed, further, that the inability of the city to furnish the right of way for a portion of the tracks would not have been reason for returning the entire $50,000 deposit, if, as is contended, the contract was to continue in full force and effect for that part of the tracks for which the city would be able to furnish a right of way. If the idea had been that the contract should thus remain in force for part, the retention of a proportional part of the $50,-000 security would have been stipulated. Why return the whole security if the whole contract was not to be at an end? No; the reason why the entire deposit was to be returned in case any portion of the tracks could not be constructed on account of the inability of the city to furnish the right of way was that the contract was in that event to be at an end. It was indivisible. It called for the construction of the whole five miles of tracks, or none. If any part of the five miles of tracks could not be constructed on account of the inability of the city to furnish the right of way, then the whole contract fell through, and the whole deposit which had been made to secure its execution would have to be returned.
The contingency of the Frisco’s having gone on and constructed a part of the five miles of road notwithstanding the success of the dock board’s opposition, could not possibly have entered the contemplation of the parties; for the very simple reason that the Frisco ordinance did not contemplate, or provide for, such a partial construction; but, on the contrary, was from its very nature, indivisible. The scheme embodied in that ordinance was the providing the city with a complete belt system through the agency of the railroads and by means of contributions from them. The reciprocal stipulations were, on the one side, that the city should have from the Frisco, first, the construction of this five miles of road, and then, secondly, the service of the Frisco in operating the belt road until such time as the road should have reached Clouet street, and the belt authorities should have provided themselves with an equipment of their own for operating the belt; and, on the other side, that, in consideration of the foregoing, the Frisco should have the use of the projected belt system. Ee it noted that the Frisco was to have the use, not of a part of a belt, or of a disconnected section of railroad strung along the upper river front of the city, but of the “completed belt system.” Plainly, under the contract, the city would have been utterly without right to demand of the Frisco the construction of one foot of tracks after the opposition of the dock board had nipped in the bud the whole scheme by which a belt system was to be brought into existence of which the Frisco was to have the perpetual use in consideration of the work which it was to do, and the service it was to render, under the contract./
*810 Indeed, had the Brisco gone on and built any portion of the tracks in question, it would, have had no right to demand compensation from the city for the work; for the city had not agreed to pay in money for the building of the tracks, or of any part of them, but only by allowing the use of the completed belt. The opposition of the dock board blocked the scheme of the Frisco ordinance as effectually and completely as if instead of bearing upon a portion only of the right of way to be furnished by the city it had borne upon the whole. The continuation of the two miles of already constructed tracks down to Toledano street would have reached defendant’s river terminals and been beneficial to defendant, but would have been of no earthly benefit to the Frisco.
Now, since the contingency of the Frisco’s having gone on and built a portion of the five miles of belt tracks, notwithstanding the success of the opposition of the dock board, is an impossible one, such- a one therefore, as the parties could not possibly have contemplated, it necessarily follows that, by the expression, “in the event the New Orleans & San Francisco Railroad Company shall complete only a portion of the tracks,” the parties meant to provide for the contingency of the dock board’s opposition hot being sustained, and of the Frisco going on and building a portion of the tracks and failing to complete the entire five miles. This was a very improbable contingency; but still a possible one. Under no other could the city have any rights to reserve against the Frisco, and under no ' other could the Frisco build one foot of tracks with any hope under the contract of ever receiving any consideration therefor.
Defendant’s learned counsel argue that the words “without legal excuse” which qualify the event of the Frisco’s failure to build the tracks, were added in defendant’s interest, and that, such being the case, defendant can waive their benefit; that the thought which dictated them was that it would be fair that any legal excuses which should have availed the Frisco for not doing the work should avail defendant also.
The answer to that argument is that there would have been no reason for extending to defendant the benefit of such legal excuses as might be personal to the Frisco; indeed, that there would have been no common sense in doing so; and that as to such legal excuses -as might not be personal to the Frisco, but common to both defendant and the Frisco, and of which therefore it would be fair to allow the benefit to defendant, there is no suggestion that any existed, or could possibly have existed, except that particular one which at that time was well known and uppermost in the thoughts of the parties— the opposition of the dock board; and that, therefore, the “legal excuse” contemplated by the parties was none other than this same opposition of the dock board.
Defendant further contends thát even if it were true that the qualifying words “without legal excuse” were added with a view simply to the opposition of the dock board, still the Frisco was without legal excuse for not building that part of the five miles of road which did not infringe upon the territory of the dock board, namely, that part down to Toledano street; and that the defendant had, in consequence the right, under the contract, to go on and build that part, and have the use of that much of the belt and of the two miles already constructed; and, in that connection the learned counsel for defendant call attention to the fact that defendant’s terminals on the river are situated above Toledano street, so that such extention of the belt road would have reached defendant’s terminals and furnished all the belt facilities it needed.
That argument had been already fully met in this opinion.
Our conclusion is that the contract with *812 defendant was conditional upon its being possible for the Erisco or defendant to construct the five miles of road, as the initial step in carrying out the scheme of having the entire belt constructed by the railroads and contributions from them; and that when the scheme became impracticable through the dock board’s opposition to it, the contract came to an end.
Judgment affirmed.
BREAUX, J., dissents.

 10th. Over the double track belt line and reservation on the river front of the city of New Orleans, from the upper limits of the city of New Orleans to Henderson street, upon the following terms and conditions:
(a)That said company shall, at its own cost and expense, construct and dedicate to perpetual public use the double track as now projected from the end of the rails on the upper side of Audubon Park to Henderson street, with all necessary and Convenient cross-overs, switches, and spur tracks, such construction to be completed before July 1, 1904, under the direction of the public belt authorities of the city of New Orleans.- Said company shall keep an accurate account of said cost of construction as herein provided, and shall present said account with proper vouchers to the said public belt authorities, who shall audit the same for the purpose of determining the aggregate amount expended under this clause, of this paragraph, of this ordinance.
(b) That the city shall furnish, a clear legal right of way for the construction of said tracks, but said company shall pay the cost and expense of removing any tracks or structures that may physically obstruct said legal right of way, and any expropriation expenses not to exceed twen,ty thousand dollars ($20,000).
(c) That the legal title to the whole of said belt tracks, switches, spurs, sidings, etc., constructed and to be constructed, shall be in the city of New Orleans, and the city shall be the sole owner of all of said tracks and their appurtenances, at all times, and under all circumstances.
(d) That said tracks shall, upon the completion of the city’s belt system to Olouet street, be under the sole and exclusive control and management of the public belt authorities of the city of New Orleans.
In order to provide for the completion of said belt system to Olouet street and its further continuation or construction, said public *782 belt authorities shall have the right and power to grant the right of use of said tracks to any railroad now in, or that may hereafter come into the city of New Orleans, exacting as a condition of said grant from each of said railroads, to which said right of use is granted, a sum equal to the amount expended as aforesaid by the New Orleans & San Francisco Railroad Company for construction of said belt tracks to Henderson street. All sums so paid to said public belt authorities in consideration of such grants, shall be deposited with the fiscal agent of the city of New Orleans, to the credit of a special fund and said fund shall not be used for any other purpose than the construction of the belt tracks, switches, side tracks, spurs, and turnouts, as part of the public belt system of the city of New Orleans, and the payment of the costs of light of way for such belt system. The New Orleans & San Francisco Railroad Company and every other company which shall contribute as aforesaid to the completion of the belt system shall have the right to use said completed belt, said use being always under the management and control of the “public belt authority,” and for such use each company shall pay its share on a wheelage basis of the cost of maintenance and of those expenses of operation and management usual and proper in, such cases.
(e)The New Orleans & San Francisco Railroad Company, and all other contributing railroads using the belt line, shall have the right to operate their own locomotives, cars, and equipment over the said public belt under the control of the “public belt authority,” provided that all railroads using said tracks shall belt all cars to and from their respective lines over all switches, spurs and sidings forming part of the public belt tracks, free of all cost.
Unless otherwise ordered by the “public belt authority,” or until said “public belt authority” is operating its own equipment over said system, completed to Clouet street, the New Orleans & San Francisco Railroad Company, agrees to belt cars belonging to connecting railroads or to individuals, firms, or corporations over the belt line, and over all switches, spurs, and sidings connected therewith and forming part thereof without discrimination, treating and handling such belted cars as justly and as equitably as .if they were its own cars, coming off its own lines, charging for such service, not exceeding $2 per car, for placing a car and returning same empty, or vice versa; provided, however, that a similar obligation shall be hereafter placed on every contributing railroad hereafter admitted to the use of said belt tracks, and provided, further, that said New Orleans & San Francisco Railroad 'Company shall not, under this clause, or under any other clause of this ordinance, be obligated to belt cars for any railroad company not now operating a line in the city of New Orleans, unless such other railroad shall become a contributor, as herein provided to the belt road construction, fund.
(f) That all controversies between the said New Orleans & San Francisco Railroad Company, on the one side, and the city or her public belt officials, or any other company or companies to which the city or her public belt authority may grant the use of said tracks and appurtenances on the other side, relative to the use of said tracks and appurtenances, or to the cost of construction or maintenance thereof, or to the rules and regulations relative to the movement and handling of cars, trains, and traffic thereon, and thereover, shall be submitted to the arbitration of three disinterested persons, one to be selected by said New Orleans & San Francisco Railroad Company, the second by the city, or her public belt officials, or such other company or companies as the case may be, and the third by the two thus chosen, and the decision of this tribunal, or of any two of them, shall have the effect of an amicable composition.
(g) That all damages to life and property caused by the fault or negligence of the officers or employés of any company, while operating over said tracks, shall be borne exclusively by said company, and the city shall in no respect be responsible therefor.
(h) That the New Orleans & San Francisco *784 Railroad Companj', its lessees, successors, and assigns, shall not discriminate at any time, illegally or unjustly, against the city of New Orleans.
(i) That the said railroad company, its lessees, successors, and assigns, shall be bound to switch or belt, without unreasonable delay, over its main tracks within the limits of the city of New Orleans, and over all other tracks laid in the public streets or public places within said city limits, owned, controlled or leased by said railroad company, its lessees, successors, or assigns, except into the private property or terminals of said railroad company — that is, depots, warehouses, elevators, and other like terminals — owned or operated by the railroad company, its lessees, successors, and assigns, for a reasonable compensation, not to exceed the maximum charge of $2 per car, their own cars and the cars of any other railroad company, now operating, or which may hereafter operate, a line of railroad within the city of New Orleans, also cars belonging to individuals, firms, or corporations, when such service shall be requested, and no unjust discrimination shall be made between different companies or individuals entitled to and requesting such service; provided, that said railroad company, its lessees, successors and assigns shall not be obliged to switch cars for other railroad companies for a less sum than other railroad companies, charge for a similar service, until such time as other railroad companies operating in the city of New Orleans agree with the city of New Orleans upon a fixed switching or belting charge; nor shall it be obliged to perform such service on its main tracks for any railroad that refuses to perform the same service for it at the same charges and under the same conditions. All cars coming to the city over,the lines of the New Orleans & -San Francisco Railroad Company shall be delivered to points on their tracks free of belting charge.
(j) That the movement of trains, cars, and traffic on and over said tracks from the upper limits of the city to Henderson street, until the city completes her belt system to Clouet street and begins to operate them as part of said system, shall be under the direction, control and management of said company, and when the city shall begin to operate said tracks as part of her completed belt system, the movement of trains, cars, and traffic on and over said tracks shall be, under the sole direction, control, and management of the public belt authority of the city of New Orleans, provided, always, that there shall be no discrimination against the cars, trains, and traffic of said company, or of any other company granted as above provided the right to use said tracks. Until the city begins to operate said tracks as part of her completed belt system, the whole cost of maintenance shall be borne by the New Orleans & San Francisco Railroad Company, unless during this period, the public belt authority shall grant to other railroads a right of operation over said tracks similar to that herein granted to said company, in which event the cost of maintenance and the usual and proper parts of the cost of operation and management shall be borne on a wheelage basis by all companies operating over said tracks. If, however, the belt is not completed to Clouet street by July 1, 1907, the sole control and management of said belt tracks shall revert to the public belt authorities of the city of New Orleans, July 1, 1907.

 See. 3. Be it further ordained, etc.,
That whereas, under Ordinance No. 1,615, N. O. S., the New Orleans & San Francisco Railroad Company, its successors or assigns, have been granted the right to construct at their own cost and expense, the double track belt line over the belt reservation on the river front, from the present end of the public belt on the upper side of Audubon Park to Henderson street, and under said ordinance company dedicates said tracks to perpetual public use, therefore under the belt provisions of said Ordinance No. 1,615, N. C. S., “and with the limitations therein which recognize and preserve the present and future rights of the city of New Orleans over the projected Public Belt Railroad,” the Louisiana Railway & Navigation Compa *786 ny is hereby granted a right of way over the double track belt line aDd reservation on the river front of the city of New Orleans from the upper limits of the city of New Orleans to Henderson street, upon the following terms and conditions:
(a) That when said Louisiana Railway & Navigation Company shall have operated its engines, trains, and cars over said belt tracks, as provided in this ordinance, for a period of thirty days, the said company shall pay to the city of New Orleans, the sum of fifty thousand dollars ($50,000) which sum is' to be deposited with the fiscal agent of the city of New Orleans, to the credit of a special fund, and said fund shall not be used for any other purpose than the extention, equipment, and operation of said public belt line and the construction of said belt tracks, switches, side tracks, spurs and turnouts, and the payment of the costs of right of way for such belt system; but no portion of this money shall be used for expenses of operation until the belt tracks are completed to Clouet street, and when said company shall be ready to begin to operate its engines, trains, and ears as above provided, the said company shall deliver to the fiscal agent of the city of New Orleans, bonds, or other securities, satisfactory to said fiscal agent, of the value of fifty thousand dollars, the same to be held in escrow as security for compliance by said company with the foregoing obligation, and to be returned to said company when said company shall have operated its engines, trains, and cars over said belt tracks, as provided in this ordinance, for a period of thirty days, and shall have paid said sum of fifty thousand dollars to said fiscal agent. If, for any reason, said company shall not have or be accorded the right to operate its engines, trains and cars over said belt tracks, as provided in this ordinance, then such securities shall be returned to said company by said fiscal agent.
(b) That in consideration of the payment of the above sum, the Louisiana Railway & Navigation Company shall have the right to operate its own locomotives, cars and equipment over the said public belt of the upper city limits to Henderson street; provided that said company and all, railroads using said tracks shall belt all cars to and from their respective lines over all switches, spurs and sidings forming part of the public belt tracks, free of cost.
(c)That in the event of the New Orleans & San Francisco Railroad Company, its successors or assigns, failing without legal excuse, to build said belt tracks from the upper side of Audubon Park to Henderson street, on or before July 1, 1904, the Louisiana Railway & Navigation Company shall build the same from the upper side of Audubon Park to Henderson street, under the. terms and conditions of paragraph 10 of section 2 of Ordinance No. 1,615, N. C. S.; and, in case said Louisiana Railway & Navigation Company shall build said tracks, it is hereby granted the right and privilege to operate its trains, cars and traffic over said tracks under all the provisions and terms of said paragraph 10 of section 2 of Ordinance No. 1,615, N. C. S., said Louisiana Railway & Navigation Company assuming the obligation of the New Orleans & San Francisco Railroad Company under said paragraph of said ordinance, and being hereby granted all the rights and privileges of said New Orleans & San Francisco Railroad Company, its successors or assigns, under said paragraph 10 of section 2 of said Ordinance, except as hereinafter provided, such construction of said tracks from the upper side of Audubon Park to Henderson street to be in lien of the payment of $50,000 referred to in paragraph (a) of this section; provided, that said Louisiana Railway & Navigation Company shall complete the said tracks to Henderson street within one year from the time the city shall furnish the clear and undisputed right of way, it being always understood that said Louisiana Railway & Navigation Company assumes all the obligations of the New Orleans & San Francisco Railroad Company under paragraph 10 of section 2 of said Ordinance No. 1,615, N. O. S.; and provided that, as soon as said belt tracks shall be completed to Henderson street, tbe same shall be turned over to the immediate *788 ownership of the city of New Orleans, and to be under the control and management of the public belt authority; and provided, further, that said Louisiana Railway & Navigation Company shall on July 1, 1904, deposit with the fiscal agent of the city of New Orleans, bonds or other securities satisfactory to said fiscal agent, of the value of fifty thousand dollars, the same to be held in escrow as security for ■ compliance by said company with the foregoing obligation, and to be returned to said company when said company shall have built and completed said belt tracks from the upper side of Audubon Park to Henderson street, and provided, further, that in case said company shall be prevented from building said belt tracks or any portion of the same, on account of the city not furnishing the right of way under the terms of Ordinance No. 1,615, N. C. S., or by causes beyond its control, then the securities deposited shall be returned to it by said fiscal agent.
Provided, further, that nothing in this ordinance or in this section or clause shall be construed as a waiver or abandonment of the rights that the city of New Orleans now has or may hereafter have under and by virtue of the provisions of Ordinance No. 1,615, N. C. S., and provided, further, that nothing in this ordinance, section or clause, shall be construed to relieve the New Orleans & San Francisco Railroad Company, its successors or assigns, from any of its obligations to the city of New Orleans, arising under the provisions of Ordinance No. 1,615, N. C. S.; and especially under paragraph 10 of section 2 of said ordinance, it being distinctly understood and declared that the city shall be entitled to enforce all its rights under said Ordinance No. 1,615, N. C. S., precisely as if this present ordinance had not been passed at all.
(d)That in the event the New Orleans & San Francisco Railroad Company, its successors and assigns, shall from any cause complete only a portion of the tracks from the upper side of Audubon Park to Henderson street, the Louisiana Railway & Navigation Company, its successors and assigns shall have the right to op-crate its own locomotives, cars and equipment over such portion of the tracks as is already built, and as may be built by the New Orleans & San- Francisco Railroad Company, its successors and assigns, and for such privilege shall pay to the city of New Orleans such proportion of the sum provided in clause (a) of this paragraph as the tracks so constructed and used by said Louisiana Railway & Navigation Company bear to the whole length of the tracks from upper city limits to Henderson street.
(e) Unless otherwise ordered by the “public belt authority” or until said “public* belt authority” is operating its own equipment over said system, completed to Clouet street, the Louisiana Railway & Navigation -Company agrees to belt cars belonging to connecting railroads or to individuals, firms or corporations, over the belt line, and over all switches, spurs and sidings connected therewith and forming part thereof, without discrimination, treating and handling such belted cars as justly and as equitably as if they were its own cars coming off its own lines, charging for such service, not exceeding $2 per car, for placing a car and returning same empty, or vice versa; provided, however, that a similar obligation shall be hereafter placed on every contributing railroad hereafter admitted to the use of said belt tracks, and provided further, that said Louisiana Railway & Navigation Company shall not under this clause, or under any other clause of this ordinance, be obligated to belt cars for any railroad company not now operating a line in the city of New Orleans, unless such other railroad shall become a contributor, as herein provided to the belt road construction fund.
(f) That all controversies between the Louisiana Railway & Navigation Company on the one side and the public belt authority, or any other company or companies to which the city or her public belt authority may grant the use of said tracks and appurtenances on the other side, relative to the use of side tracks and appurtenances or the cost of construction or maintenance thereof, or the rules and regulations relative to *790 the movement and handling of cars, trains and traffic thereon and thereover shall be submitted to the arbitration of three disinterested-persons; one to be selected by said Louisiana Railway & Navigation Company; the second by the public belt authority, or such other company or companies, as the case may be; and the third by the two thus chosen; and the decision of this tribunal, or any two of them, shall have the effect of an amicable composition.
(g) That all damages to life and property caused by the fault or negligence of the officers or employés of any company, while operating over -said belt tracks, shall be borne exclusively by said company, and the city shall in no respect be responsible therefor.
(h) That the Louisiana Railway & Navigation Company, its lessees, successors and assigns shall not discriminate at any time, illegally or unjustly, against the city of New Orleans.
(i) That the said Louisiana Railway & Navigation Company, its lessees, successors and assigns, shall be bound to switch or belt, without unreasonable delay over its main tracks, within the limits of the city of New Orleans, and over all other tracks laid in the public streets or public places within said city limits, and all switches connected therewith, owned, controlled or leased by said railway company, its lessees, successors or assigns, except into the private property or terminals of said railway company, that is, depots, warehouses, elevators and other like terminals, owned or operated by the railway company, its lessees, successors and assigns, for a reasonable compensation, not to exceed the maximum charge of $2 per car, its own cars, the cars originating on the public belt, and the cars of any other railroad company now operating, or which may hereafter operate a line of railroad within the city of New Orleans, also cars belonging to individuals, firms or corporations, when such service shall be requested, and no discrimination shall be made between different companies or individuals entitled to and requesting such service; provided, that said railway company, its lessees, successors and assigns, shall not be obliged to switch cars to or from the tracks of other railroad companies for a less sum than other railroad companies charge it for a similar service, until such time as other railroad companies operating in the city of New Orleans agree with the city of New Orleans upon a fixed switching or belting charge; nor shall it be obliged to perform such service on its main tracks for any railroad that refuses to perform the same service for it on its main tracks and for the same charges and under the same conditions. All cars coming to the city over the lines of the Louisiana Railway & Navigation Oompany shall be delivered to points on its tracks free of belting charges.
(j)That the movement of trains, cars, and traffic on and over said tracks from the upper limits of the city to Henderson street until the city completes her belt system to Clouet street, and begins to operate them as a part of said system, shall be under the joint direction, control and management of the New Orleans & San Francisco Railroad Oompany, its successors and assigns, and the Louisiana Railway & Navigation Company, its successors and assigns, unless during this period the public belt authority shall grant other railroads a right of operation over said tracks similar to that herein granted to the Louisiana Railway & Navigation Oompany, in which event the control and management of movement of trains, cars and traffic over said tracks to Henderson street, shall be under the joint control of such companies as may be granted the same right of operation over said tracks, and when the 'city shall begin to operate said tracks as part of her belt system, the movement of trains, cars, and traffic on and over said tracks shall be under the sole direction, control and management of the public belt authority of the city of New Orleans, provided always that there shall be no discrimination against the trains, cars and traffic of the Louisiana Railway & Navigation Oompany or any other company, granted the right to use said tracks. Until the city begins to operate said tracks as part of her belt system, the whole cost of maintenance, operation and management shall be borne jointly by the New Or *792 leans & San Francisco Railroad Company, its successors and assigns, and the Louisiana Railway & Navigation Company, its successors and assigns on a wheelage basis, unless during this period the public belt authority shall grant to other railroads a right of operation over said tracks similar to that herein granted to said Louisiana Railway & Navigation Company, in which event, the cost of maintenance and the usual and proper parts of the cost of operation and management shall be borne on a wheelage basis by all companies operating over said tracks. If, however, the belt is not completed to Clouet street by July 1, 1907, and the tracks to Henderson street, or any part thereof, are constructed by the New Orleans & San Francisco Railroad Company, the sole control and management of said belt tracks shall revert to the public belt authorities of the city of New Orleans; provided always, if for any reason the city of New Orleans or her public belt authorities shall not assume control and management of said tracks on July 1, 1907, the Louisiana Railway & Navigation. Company shall have the same right of control and management of the movement of trains, cars, and traffic over said tracks as has heretofore, or may be hereafter granted to any railroad company.
(k) That in the event said belt tracks shall be completed to Clouet street, and said Louisiana Railway & Navigation Company shall desire to use that portion of the belt which may be built from Henderson street to Clouet street, it shall have the right to operate its trains, cars, and traffic over the completed belt, upon the payment to the fiscal agent of the city for the use and benefit of the belt fund, of a sum which, added to the sum to be paid under clause (a), section 3, of this ordinance, shall make the total sum paid by said Louisiana Railway & Navigation Company equal to the cost of the construction of the belt tracks from the upper side of Audubon Park to Henderson street, expended by the New Orleans & San Francisco Railroad Company, its successors or assigns, in the construction of said tracks from the upper side of Audubon Park to Henderson street, as provided in Ordinance No. 1.615, N. O. S.
Provided that in the event the belt shall be extended to Clouet street, and that the Louisiana Railway & Navigation Company shall not avail itself of the right to pay the additional sum as above provided and use the belt to Clouet street, within a period of five years from the time said belt is completed to Clouet street, then in that event, the said Louisiana Railway & Navigation Company shall pay to the public belt authority of the city of New Orleans the sum of thirty thousand dollars ($30,000), the use and destination of said sum to be the same as provided for in the payment of the fifty thousand dollars ($50,000) as above provided for. Said additional payment of thirty thousand dollars shall in no wise, however, authorize the using of the belt below Henderson street by the said Louisiana Railway & Navigation Company.
Provided, further, that any use by the Louisiana Railway & Navigation Company of the belt track from Henderson street to Clouet street, after the same shall have been completed, shall be deemed conclusive evidence of its agreement to accept the use of said entire belt, but shall not bind the said Louisiana Railway & Navigation Company as admitting the cost of the construction from the upper limits of Audubon Park to Henderson street, to be the amount stated by the New Orleans & San Francisco Railroad Company, its successors and assigns. It being understood that this right is granted under the limitations of Ordinance No. 1,615, N. C. S., which recognize and preserve all the present and future rights of the city of New Orleans over the projected belt railroad from the upper limits of the city to Clouet street. -